PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Michael Albert Hernandez Jr. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm Hernandez’s convictions and sentences.
FACTS AND PROCEDURAL HISTORY
According to the testimony at trial, in the fall of 2004, Hernandez and his wife, Stephanie Hernandez, moved from Mur-freesboro, Tennessee, to Milton, Florida. In Milton, Hernandez worked with Richard Hartman Sr.,[1] one of his mother’s former husbands, and with Christopher Shawn Arnold, who was dating and had a baby with the daughter of Richard Sr.’s wife, Daveine (Tammy) Hartman.
On the morning of November 18, 2004, Arnold left the home he shared -with Richard Sr.’s stepdaughter, Michelle Rose, in his car and returned an hour later with Hernandez. Arnold and Hernandez then left in Arnold’s car, bought crack cocaine, and smoked it. Arnold had a crack addiction, and his primary connection for crack was David Everett, who was also known as “Snapper.” David lived with his mother, Ruth Everett, who drove him to work before 8 a.m. on the morning of November 18. That same morning, Hernandez and *648 Arnold later drove to the Everett house, looking for more crack or money.
Hernandez and Arnold went up to the door, knocked, and started talking with Ruth. They asked if David was home, and Ruth told them that he was not there. After finding out that David was not there, they decided to get money from her. Arnold told Hernandez to “grab her,” and Hernandez grabbed Ruth and took her inside the house. Arnold made up a stoxy about her son owing him money in an attempt to get money from her, and she told them that all she had was $20. Arnold then asked to use the bathroom and came back with a pillow. Arnold stuck the pillow over Ruth’s face, and Arnold told Hernandez to grab Ruth’s hands, which he did. Hernandez later told different stories about what happened next. Ultimately, Ruth’s neck was broken, and Hernandez stabbed her in the neck with a pocket knife.
Arnold then took Ruth’s purse, and they left. They found Ruth’s debit card and PIN in her purse, and they used her debit card at several ATMs. In all, they took $500, which they spent on crack. They also stopped at Arnold’s house and cleaned out his car, and Arnold threw the purse away in a dumpster near his house.
David, who had finished up work, called his house at noon. After he did not get an answer, he received a ride home from a coworker. When he entered his home, he saw his mother lying on the couch and called 911. Deputy Charles Stephens of the Santa Rosa County Sheriffs Office responded. The victim was pronounced deceased at the scene.
Meanwhile, Hernandez and Arnold spent all of the money from the ATMs on crack. Arnold then dropped Hernandez off at Hernandez’s home and returned to his own home that evening.
The next morning, November 19, 2004, Arnold had a conversation with Rose, after which Rose called Tammy, who came over and spoke with Arnold. After they spoke, they went outside to Arnold’s car, and Arnold pulled a pocket knife from under the passenger seat. Tammy placed the knife in a white cloth and observed a brown substance on the knife that she thought was blood. Arnold also told her that he had thrown the victim’s purse in the dumpster and showed Tammy a trash bag with the purse in it. Tammy took the bag (with the purse in it) and the knife to the bed of Richard Sr.’s truck, which she had driven there. Tammy then drove to her home to get Richard Sr.
She and Richard Sr. then drove to Hernandez’s house, where Hernandez was with his wife and children. Tammy asked Hernandez if “he wanted to talk to [her] about the crack party he just went on” and if he wanted to tell her “about the lady,” and she told him that she had “the bloody knife and her purse.” Hernandez told Tammy that “[h]e was hoping [she] only knew about the crack.” He also said that the lady “was old and it was her time to go.”
At some point while the Hartmans were at the Hernandezes’ house, Tiffany Telin, Stephanie’s sister, and her husband walked into the house. Hernandez and his wife had left their two children in Tennessee with Telin and her husband for a visit, and Telin and her husband had brought the children to Florida to be reunited with the Hernandezes the night before. Telin observed Stephanie crying and asked Stephanie what had happened. Stephanie said that Hernandez and Arnold had killed a woman. Telin then asked Hernandez what had happened. Hernandez told her that he and Arnold had gone over to the house of Arnold’s friend, trying to get crack. Hernandez told Telin that Arnold had *649 come up with the idea to get some money for crack when the friend was not there. Hernandez also told Telin that Arnold got a pillow and “stuck it over the lady’s face.” Hernandez told Telin that Hernandez killed the lady when she was “almost dead” by stabbing her in the throat. Hernandez also said that he and Arnold went to ATMs to get money with the lady’s ATM card.
The Hartmans, the Hernandezes and them children, and the Telins then drove over to Arnold and Rose’s house. After discussing it with his wife, Hernandez had decided to turn himself in and was going over there so he and Arnold could turn themselves in. Inside the house, Arnold, Hernandez, and the Hartmans began arguing, and somebody called the police. Hernandez and his wife left, passing the police in them car on their way out. Arnold turned himself in to law enforcement at the house. Richard Sr., who had moved the trash bag with the knife and purse in it from his truck back into the dumpster, got it out, and the bag was turned over to law enforcement.
Later that day, Hernandez drove to the Milton Police Department and turned himself in. His wife also brought to the police station the clothing, including a grey T-shirt, which Hernandez had been wearing on November 18. Detective Jeffrey Shu-ler of the Santa Rosa County Sheriffs Office Major Crime Unit transported Hernandez to his office, and he and Detective Lawrence Tynes interviewed Hernandez. An audio recording of Hernandez’s statements was introduced at Hernandez’s trial.
According to Hernandez’s statements, the following events occurred on November 18 and 19, 2004. Hernandez left his house at 8:30 a.m. on November 18 to go to work, but he and Arnold instead “went to a crack friend’s house and got some crack ... with the gas money and cigarette money [Hernandez] had for the day.” Although he had used crack before moving to Florida, Hernandez had not used it since moving to Florida. They were “doing crack,” and Arnold suggested going to the house of “Snapper,” an individual whom Arnold knew. Arnold had done cocaine with “Snapper” before, but Hernandez did not know him. Arnold told him “he was going to try and get some money.” Hernandez and Arnold drove to “Snapper’s” house in Arnold’s car. They went to the door and spoke with an “old lady” at the house. Arnold told Hernandez to “grab her,” and Hernandez grabbed the lady by the mouth and pulled her into the house. Hernandez “got her quiet” and told her, “shh, calm down, calm down. We ain’t going to hurt you.” The lady sat down in a chair. Arnold told the lady that “Snapper” owed him $300 and that Arnold had a gun put to his head over this money. Arnold had made up this story. Arnold told her that they would try to get the money from her and that they would leave her son alone if they got the money. The lady told them that all she had was $20. Arnold said, “All right,” and then asked to use the bathroom and came back with a pillow. Arnold stuck the pillow over the lady’s face while she was still in the chair. Arnold told Hernandez to grab the lady’s hands, and Hernandez did. Hernandez and Arnold were “suffocating her” and she was “struggling.” While Hernandez and Arnold were “choking her,” “she stopped moving for a minute.” Hernandez said the following then occurred: “And we let her up and tried to drag her over to the couch and lay her down. And she drops, and I go to grab her, and I grab her head. And her head cracked. And Shawn helped me get her on the couch. And I ... got the knife from him and cut her neck.... After she was dead.” Hernandez had grabbed Arnold’s pocket knife before entering the house and had used it to “chop up a crack *650 block earlier.” Hernandez said he did not know why he cut the lady’s neck.
According to Hernandez’s statements, Arnold then took the lady’s purse, and they left carrying it as well as the pillow. They threw the pillow away on the highway.[2] Hernandez and Arnold also went through the lady’s purse together, finding only $40. Hernandez remembered seeing that the lady’s name was “Ruth something.” Hernandez and Arnold then went to get some crack and tried to use the debit card in the purse. Arnold found the PIN written on a card in the wallet, and Hernandez and Arnold then stopped at several ATMs. Arnold obtained money from one of the ATMs, and Hernandez obtained money from the others. They spent the money on crack. They also stopped at Arnold’s house and cleaned out his car, and Arnold threw the purse away in a dumpster near his house. They then went back out and got more crack, using the money taken from the lady’s account. They spent all of the money, and Arnold dropped off Hernandez at his home after they took a last hit of crack that afternoon. The next day, Richard Sr. showed up at Hernandez’s house, and Hernandez told him and Stephanie what had happened.
After Hernandez and Arnold were arrested, Tammy visited them both in jail. Hernandez told her that they went to the lady’s house to “get some more crack.” Hernandez told her that they had gone to the door and asked if “Snapper” was home, and the lady told them that he was not home. Hernandez said he thought he heard Arnold say, “Grab her,” so Hernandez “got a hold of her in a choke hold” and brought her in the house. Hernandez told her that Arnold went to the bathroom and came back with a pillow, which he put over the lady’s face. Hernandez said that “the woman just wouldn’t die” when Arnold put the pillow over her face. Hernandez told Tammy that Arnold then took a baggy and tried to help the lady breathe because she was hyperventilating and “so she could calm herself down.” Hernandez said Arnold “was a pussy; he couldn’t do it.” Hernandez told Tammy that Arnold said to him, “I told you we weren’t going to do this.” Hernandez said that he knocked Arnold back. Hernandez told Tammy that he then snapped the lady’s neck, and he demonstrated to Tammy how he did it. Hernandez told Tammy that “she was grabbing him, trying to scratch him, and she just wouldn’t die and he snapped her neck.” Hernandez said that he and Arnold then put the lady on a chair, and Hernandez stuck a knife in her neck. Hernandez told Tammy that he killed the lady and cut her throat “[bjecause she’d seen their faces.”
On December 18, 2004, Hernandez was indicted with one count of premeditated or felony murder while carrying a knife and one count of robbery with a deadly weapon. Hernandez was later charged by information with one count of burglary with an assault or battery. The court consolidated these charges, over defense objection.
At Hernandez’s trial, the jury heard testimony from Deputy Stephens, David Everett, Michelle Rose, Tammy Hartman, Tiffany Telin, Detective Shuler, and other witnesses (including crime scene technicians and a representative from the victim’s bank), in addition to hearing Hernandez’s statements about the matters discussed above. Hernandez did not present any witnesses.
Dr. Andrea Minyard, the medical examiner who had performed the autopsy of Ruth Everett, also testified. Minyard tes *651 tified that the victim had a wound on her neck that was between one-half-inch and one-inch deep and four-and-a-half-inches across. She testified that the victim’s fifth cervical vertebra was fractured and that she had a laceration to her spinal cord beneath the fracture. Minyard also testified that the victim had bruising on her face and body. She testified that some of the bruising on the victim’s face could have been from being smothered, and some of it could have been caused by a person grabbing her across the face. She also testified that bruising to the victim’s body was consistent with her having been grabbed and forced upon. She testified that the victim’s broken neck was consistent with having been caused by an upward motion. However, she also testified on cross-examination that a pillow being pushed against the victim’s face could have caused a fracture to her neck or that she could have fractured her neck if she had been dropped. Minyard testified that the wound on the victim’s neck appeared to have been caused by a knife being taken across her neck from right to left and that the knife that had been obtained by law enforcement at Arnold’s house was capable of causing the wound.
Minyard testified that the victim’s cause of death was “combined effects of blunt and sharp force injuries of the neck.” Minyard explained that either the broken neck with the laceration of the spinal cord or the slash through the neck could have been fatal. Minyard testified that the victim possibly could have survived either the broken neck and lacerated spinal cord or the slashed neck if she had received medical intervention. Minyard testified that there would have been some loss of function from the ruptured spinal cord, but how much was unclear. Minyard testified that the victim could have been seeing and hearing what happened to her after her neck was broken and could have felt pain if she was conscious when her neck was cut. However, she also testified on cross-examination that she could not say whether the victim was conscious after her neck was broken. Minyard testified that based on the amount of blood, she concluded that the victim’s heart was still beating and that she was still alive when her neck was cut.
Curtis Browning, a crime laboratory analyst, also testified. He testified that blood on the knife recovered by law enforcement had DNA that matched Ruth’s DNA. He also testified that Hernandez was a possible contributor of DNA found under the victim’s fingernails and that Arnold’s DNA was not present. Browning also testified that DNA obtained from blood found on Hernandez’s grey T-shirt also matched the victim’s DNA.
On February 6, 2007, the jury found Hernandez guilty on all three counts: first-degree murder while using, carrying, or possessing a weapon;[3] robbery with a deadly weapon; and burglary of a dwelling with assault or battery.[4]
During the penalty phase, the State presented victim impact evidence through Elaine Simpson and Judy Morrissey, friends of Ruth. They testified that Ruth was a supportive friend and a hard worker, who was concerned about her son David’s drug use.
*652 The State also presented testimony from Santa Rosa County detention deputies concerning Hernandez’s behavior while he was incarcerated. Deputy Matthew Bartley testified about Hernandez’s attack on his codefendant while they were housed in the same cell. The State introduced into evidence Arnold’s medical records concerning his treatment as a result of the altercation and a copy of the judgment of Hernandez’s conviction and sentence for battery upon a jail detainee. The State also presented testimony from Deputy John Wade Jarvis, who testified about being attacked by Hernandez while transporting him to a doctor’s office for a psychological evaluation. The State introduced into evidence a copy of the judgment of Hernandez’s conviction and sentence for aggravated battery on a law enforcement officer.
The State also presented testimony from the defendant’s wife. Stephanie testified that when the Hartmans came to their house on November 19, 2004, Hernandez told them that he cut the victim’s throat “[t]o make sure she was dead.”
The defense then presented testimony from Hernandez’s half-brother, Richard Hartman Jr., and Hernandez’s mother, Cheryl Walker,[5] about Hernandez’s dysfunctional childhood in which he was exposed to drugs and violence from a young age. According to them testimony, Cheryl and Hernandez’s father, Michael Hernandez Sr., used marijuana on a regular basis in Hernandez’s presence when he was a child and also used crystal methamphetamine and cocaine. They wandered around the country and were in hiding from the Bandidos, a motorcycle group from which they had fell out of favor. Cheryl later left Michael Sr. and relocated to California with Hernandez. In California, Cheryl, who was no longer using methamphetamines but was drinking heavily, briefly reunited with Michael Sr. They later separated, and Cheryl left Hernandez, who was approximately three years old at the time, with his father while she sold drugs. Michael Sr. lived with the Esterbrooks, who were also using and dealing drugs.
Richard Jr. and Cheryl testified that Hernandez returned to live with Cheryl several years later after she met and married Michael Murphy. Murphy, who also abused drugs, beat Cheryl in front of her children and was jailed for putting a gun in her mouth. Cheryl sent Hernandez back to his father because she was afraid for his life when she was with Murphy. Hernandez lived with his father in a hotel room until his father’s death from a drug overdose.
Richard Jr. and Cheryl also testified that Hernandez lived with Cheryl and her new husband, Anthony Walker. Anthony was verbally and physically abusive, and Hernandez witnessed him choke, beat, and shake Cheryl. Anthony also once punched Hernandez so hard that he needed an appendectomy. Furthermore, both Cheryl and Anthony used alcohol and marijuana.
According to the testimony of Hernandez’s relatives, Cheryl later sent Hernandez to live with the Esterbrooks once more, and Hernandez never lived with her again. Hernandez reported being beaten and molested at the Esterbrooks’ home, and he eventually left their home and was in the custody of the state.
In addition, Richard Jr. and Cheryl testified that Hernandez’s paternal grandparents, Al and Barbara Hernandez, later took him to live with them, and he never saw his mother again until he testified for *653 her at her trial for killing Anthony. Hernandez then stayed with Richard Jr. as well as with his other half-brother, Shawn Hartman. Hernandez also lived on the streets. After Richard Jr. found this out, he talked Hernandez into living with him again in Florida, where Hernandez alternated living with Richard Jr. and Richard Sr. Hernandez used cocaine during this time and smoked marijuana. Hernandez later moved to Tennessee with his wife.
The defense also presented testimony from Dr. John Bingham, a mental health counselor. Bingham testified that Hernandez met the diagnostic criteria for a chemical dependency to marijuana and cocaine. Bingham also testified that he believed that Hernandez and Arnold’s actions on November 18, 2004, appeared to reflect “an absence of thinking and more reaction to the situation as it unfolded.... All they were interested in is responding in the sense of getting crack cocaine.” Bingham testified that he believed that Hernandez’s ability to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired as a result of his chronic cocaine use and being under the influence at the time as well as because of the psychological and physical abuse he had experienced.
The defense also presented testimony from Dr. Brett Turner, a neuropsychologist. Turner testified that because of Hernandez’s “lack of participation” and lack of motivation several of the tests he had performed were invalid, including the neurological testing. However, Turner testified that Hernandez’s IQ score was accurate; Hernandez’s full scale IQ score was 89, which was in the low-average range. Turner also testified that Hernandez’s achievement testing, which also was valid, identified a learning disability for spelling and written expression. Moreover, Turner testified that while he was not able to substantiate damage to Hernandez’s frontal lobe because of the invalid neurological test score, he believed that Hernandez’s history suggested it. Turner also had several diagnoses, including polysubstance dependence disorder, depressive disorder, posttraumatie stress disorder, impulse control disorder or cognitive disorder not otherwise specified, and antisocial personality disorder. Turner also opined that Hernandez was “under extreme emotional disturbance at the time of the offense as a result of a chronic history of emotional instability deficits and behavior control and deficits in his reasoning and cognitive abilities all acutely exacerbated by the effects of cocaine intoxication.” In addition, Turner opined that Hernandez’s capacity to appreciate the criminality of his conduct was substantially impaired “because appreciate actually means to be fully aware, and I do not believe that he was fully aware at the time of the incident offense. I believe he was engaged in a string of behavioral responses, one leading to the next....”
The defense also offered into evidence Arnold’s judgment and sentence for the crimes. Arnold pleaded nolo contendere to felony murder with a deadly weapon and was sentenced to a term of life imprisonment without the possibility of parole.
The State then presented testimony from Dr. Harry McClaren, a forensic psychologist. McClaren testified that one of the two psychological tests he had administered was invalid due to an overreporting of psychopathology and that the other one was technically valid but also was exaggerated by Hernandez. McClaren also noted that the IQ test showed that Hernandez had a full scale IQ of 89, which was in the upper bounds of the low-average range. McClaren also opined that Hernandez suffered from posttraumatie stress disorder and some form of depression, which was *654 compounded by polysubstance dependence. McClaren also testified that based on a history of head injuries and records indicating a learning disability, Hernandez might have some degree of brain dysfunction, which McClaren characterized as a cognitive disorder not otherwise specified. McClaren also testified that Hernandez had antisocial personality disorder and borderline personality disorder. When asked if the mental health disorders had a causal effect on Hernandez’s conduct in the murder of Ruth Everett, McClaren said no. He testified that posttraumatic stress disorder, depression, antisocial personality disorder, and borderline personality disorder might heighten the risk of substance abuse, which “would be an indirect rather than a direct link” to his criminal conduct. McClaren also opined that Hernandez was not under extreme mental or emotional disturbance. McClaren explained that Hernandez was intoxicated on cocaine, which in McClaren’s belief, did not give rise to the level of the statutory mitigating circumstance. McClaren also opined that Hernandez was not acting under extreme duress or under the substantial domination of another person. McClaren further testified that Hernandez’s ability to appreciate the criminality of his conduct or conform his conduct to the requirements of law was not substantially impaired. McClaren testified that while Hernandez was impaired from cocaine at the time, he was not substantially impaired and was able to engage in “goal-oriented behavior.”
The State also entered into evidence a copy of Hernandez’s judgment and sentence in Tennessee for misdemeanor theft.
On February 9, 2007, the jury recommended the death penalty by a vote of eleven to one. The court then held a Spencer[6] hearing on March 9, 2007. As rebuttal to the statutory mitigator of lack of significant prior criminal history, the State offered testimony regarding Hernandez’s conviction for petit theft. The defense then offered unsworn testimony from Barbara Hernandez (Hernandez’s step-grandmother) and Richard Jr., and defense counsel read a statement that Hernandez had prepared.
At the sentencing hearing held on March 22, 2007, the court sentenced Hernandez to death. The court found four aggravating circumstances: (1) Hernandez was previously convicted of another felony involving the use or threat of violence to the person, namely aggravated battery on a law enforcement officer with great bodily harm and with a weapon and battery upon a jail detainee (great weight); (2) the capital felony was committed while Hernandez was engaged in the commission of the crimes of robbery with a deadly weapon and burglary of a dwelling with assault or battery while armed with a dangerous weapon and while the dwelling was occupied by a person (great weight); (3) the capital felony was committed for the purpose of avoiding or preventing lawful arrest or effecting an escape from custody (great weight); and (4) the capital felony was especially heinous, atrocious, or cruel (HAC) (great weight).[7] The trial court found the statutory mitigator of lack of significant history of prior criminal activity (some weight).[8] The court also evaluated *655 the nonstatutory mitigating circumstances offered by Hernandez.[9]
The court gave great weight to the jury’s recommendation and found that “[although mitigating circumstances exist in this case, the serious aggravating circumstances which have been proven beyond a reasonable doubt greatly outweigh the mitigating circumstances.” The court sentenced Hernandez to death for the first-degree murder and sentenced him to *656 consecutive life sentences for the robbery and burglary.
ANALYSIS
Hernandez raises eight claims on appeal. We will discuss each of these issues in turn below as well as the sufficiency of the evidence and the proportionality of Hernandez’s death sentence.
SUFFICIENCY OF THE EVIDENCE
Although Hernandez does not raise the issue of sufficiency of the evidence on appeal, we have an obligation to independently review the record to determine whether sufficient evidence exists to support Hernandez’s convictions. See Bevel v. State, 983 So.2d 505, 516 (Fla.2008); see also Fla. R.App. P. 9.142(a)(6) (“In death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief.”).
Hernandez was convicted of first-degree murder, robbery with a deadly weapon, and burglary of a dwelling with assault or battery. The jury was instructed on both premeditated and felony murder, and the jury found Hernandez guilty on a general verdict form. Because the jury was instructed on both theories of first-degree murder and found Hernandez guilty on a general verdict form, the evidence must support either premeditated or felony murder. See Dessaure v. State, 891 So.2d 455, 472 (Fla.2004).
We have reviewed the record, and we find the evidence, as detailed above, sufficient to support Hernandez’s murder conviction on either theory of first-degree murder as well as his convictions of robbery and burglary.
MOTION TO STRIKE THE VENIRE
Hernandez argues that the trial court erred by denying his motion to strike the venire and motion for a mistrial after a prospective juror, Kevin Mancusi, saw Hernandez in shackles. He argues that the court failed to protect his right to a fair trial and right to the presumption of innocence. However, Hernandez does not challenge the trial court’s determination that shackling was necessary.
First, it is well accepted that shackling a defendant during a criminal trial is “inherently prejudicial.” Holbrook v. Flynn, 475 U.S. 560, 568, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986); see Bello v. State, 547 So.2d 914, 918 (Fla.1989). Visible shackling interferes with the accused’s presumption of innocence and the fairness of the fact-finding process. Deck v. Missouri, 544 U.S. 622, 630, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005); Bryant v. State, 785 So.2d 422, 428 (Fla.2001). For that reason, visible shackles must not be used unless “justified by an essential state interest” specific to the defendant on trial. Deck, 544 U.S. at 624, 125 S.Ct. 2007 (quoting Holbrook, 475 U.S. at 569, 106 S.Ct. 1340).
But though it is widely recognized that visible shackling is inherently prejudicial to a defendant, it is just as accepted that the right to be free of shackles is not absolute; shackles may be used when warranted by the circumstances. See Deck, 544 U.S. at 633, 125 S.Ct. 2007; Bryant, 785 So.2d at 428. The right may be overcome by considerations such as “physical security, escape prevention, or courtroom decorum.” Deck, 544 U.S. at 628, 125 S.Ct. 2007; see also Bryant, 785 So.2d at 428. For example, the necessity of shackles may be sufficiently shown “where there is a history or threat of escape, or a demonstrated propensity for violence.” Jackson v. State, 698 So.2d *657 1299, 1303 (Fla. 4th DCA 1997). Shackling is a permissible tool to be exercised in the judge’s sound discretion under such circumstances. Bryant, 785 So.2d at 428.
Furthermore, to determine whether shackles are necessary to ensure the safety and security of the defendant and the other individuals present during trial, the trial court must hold a hearing if the defendant objects and requests an inquiry into the necessity for shackling. See Bryant, 785 So.2d at 429.
In this case, the State sought to have Hernandez shackled on request of the sheriffs office. Upon objection by defense counsel, the trial court conducted the required evidentiary hearing to determine the necessity of shackling. Based on the testimony and arguments presented, the trial court found that shackling Hernandez was necessary and ordered Hernandez shackled. The trial court based its determination on the fact that Hernandez had twice committed a battery against law enforcement officers, had been convicted of battery on his codefendant after fighting with him in their jail cell, had threatened a law enforcement officer when she did not provide him with a razor after one of the attacks on a law enforcement officer, had self-mutilated with a razor during a previous trial, and was indicted for capital murder which could result in the imposition of a death sentence. The trial court also determined that a stun belt would not be as effective as shackles, as it could malfunction and might not prevent Hernandez from suddenly engaging in an act of violence against himself or others.
Furthermore, upon determining that shackling was necessary but aware of its obligation to ensure that Hernandez receive a fair trial, the trial court immediately ordered that precautions be implemented to prevent the jury from seeing Hernandez’s shackles. The trial court ordered that the counsel tables be formed into “L” shapes to block the shackles from the jury, that no “All rise” instruction would be given when the jury entered or left the courtroom, that the State stack boxes under chairs parallel with the jury box to form an additional visual barrier between the jury and Hernandez, that bunting be placed around the bottom of the counsel tables to keep the jury from seeing beneath them, and that a podium be used as a visual block in the courtroom.
Despite the trial court’s efforts, one prospective juror, Kevin Mancusi, informed the court during individual voir dire that during a break, he saw the shackled ankles of a person whom he believed to be Hernandez underneath a chalkboard set up in the hallway outside the courtroom. Man-cusi indicated difficulty in maintaining a presumption of innocence after seeing the shackles. However, Mancusi did not know whether any other prospective jurors present in the hallway at the time saw the shackled individual, and he did not discuss it with any other members of the venire. He also stated that he did not see anything inside the courtroom that led him to the conclusion that Hernandez was shackled but that the measures that had been taken were obvious to him “after the fact.” The trial court excused Mancusi for cause.
After Mancusi’s individual voir dire, the defense moved to strike the venire and for a mistrial. Even though the trial court agreed with defense counsel that shackling was “inherently prejudicial,” it denied the defense’s motions, explaining that it was aware of the possibility that members of the jury would eventually become aware that Hernandez was shackled, despite the steps taken by the court, and noting that it did what was necessary under the circumstances.
*658 This Court reviews a trial court’s ruling on a motion for mistrial under an abuse of discretion standard. England v. State 940 So.2d 389, 402 (Fla.2006) (citing Perez v. State, 919 So.2d 347 (Fla. 2005)). A trial court’s decision on whether to dismiss a venire is also reviewed for an abuse of discretion. Valderrama v. State, 816 So.2d 1143, 1144 (Fla. 4th DCA 2002).
We have long held that a juror’s or prospective juror’s brief, inadvertent view of a defendant in shackles is not so prejudicial as to warrant a mistrial. See, e.g., Singleton v. State, 783 So.2d 970, 976 (Fla. 2001) (explaining that the jurors’ brief glances of the defendant while he was being transported in prison garb and shackles, standing alone, were not so prejudicial as to require a mistrial); Stewart v. State, 549 So.2d 171, 174 (Fla.1989) (finding that a new trial was not warranted where the defendant’s shackles were ruled unobtrusive and necessary by the trial court and were only barely visible beneath the table); Heiney v. State, 447 So.2d 210, 214 (Fla.1984) (holding that the jurors’ possible inadvertent and brief sight of the defendant being transported into the courtroom in chains did not justify a mistrial); Neary v. State, 384 So.2d 881, 885 (Fla.1980) (concluding that the jurors’ inadvertent sight of the defendant being brought into the courtroom in handcuffs was not so prejudicial as to require a mistrial). Thus, the mere fact that a prospective juror saw the shackled ankles of a person whom he believed to be Hernandez underneath a chalkboard set up in the hallway outside the courtroom is not sufficient, standing alone, to warrant a mistrial or dismissal of the venire.
Moreover, the fact that Hernandez’s shackles may have become visible to even all of the jurors does not mean that the court should have granted his motion for a mistrial or motion to strike the venire. Although a court cannot place a defendant in visible restraints as a routine matter, the Constitution “permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling.” Deck, 544 U.S. at 633, 125 S.Ct. 2007. Shackles are permissible if the trial court determines that such restraints are necessary to ensure the safety and security of those present during trial. See Bryant, 785 So.2d at 428. This clearly suggests that a trial court, in its discretion, may legitimately deny a motion for mistrial or motion to strike the venire that may have seen a defendant shackled, provided that it has made the requisite findings that such shackles are necessary. As explained above, the trial court found that shackles were necessary and gave multiple, case-specific justifications for its decision. Furthermore, the trial court made extensive efforts to prevent the jury from seeing Hernandez’s shackles.
In sum, we find that the trial court did not abuse its discretion in denying the motion for mistrial and motion to strike the venire, given that the record merely indicates that one prospective juror saw the shackled ankles of a person whom he believed to be Hernandez underneath a chalkboard set up in the hallway outside the courtroom, the trial court took numerous precautions to reduce the visibility of the shackles, and the trial court had a substantial foundation to find that shackles were necessary and relied on that foundation to justify their use.
JUROR CHALLENGE FOR CAUSE
Hernandez argues that the trial court erred in refusing to grant Hernandez’s challenge for cause to juror Martina *659 Lindquist.[10] Hernandez contends that because there was a reasonable doubt about Lindquist’s ability to render an impartial verdict, the trial court violated his constitutional rights by not excusing her. Hernandez argues that a reasonable doubt existed because Lindquist had personal encounters with substance abuse through family members’ drug addictions and had extensive contacts with law enforcement and the criminal justice system.
The Sixth and Fourteenth Amendments to the United States Constitution guarantee a defendant the right to an impartial jury. Ross v. Oklahoma, 487 U.S. 81, 85, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) (citing Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)). Under Florida law, “juror impartiality is a firm basis for excusing a prospective juror for cause.” Busby v. State, 894 So.2d 88, 99 (Fla.2004). “The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given to him by the court.” Lusk v. State, 446 So.2d 1038, 1041 (Fla.1984) (citing Singer v. State, 109 So.2d 7 (Fla.1959)). If any reasonable doubt exists as to whether a juror possesses an impartial state of mind, the juror must be excused for cause. Busby, 894 So.2d at 95.
“In reviewing a claim of error such as this, we have recognized that the trial court has a unique vantage point in the determination of juror bias. The trial court is able to see the jurors’ voir dire responses and make observations which simply cannot be discerned from an appellate record.” Smith v. State, 699 So.2d 629, 635-36 (Fla.1997) (citing Taylor v. State, 638 So.2d 30, 32 (Fla.1994)). Thus, it is within the province of the trial court to determine whether a challenge for cause is proper. Busby, 894 So.2d at 95 (quoting Fernandez v. State, 730 So.2d 277, 281 (Fla.1999)). The decision whether a challenge for cause is proper presents a mixed question of fact and law that will not be overturned in the absence of manifest error. See Smith, 699 So.2d at 636.
While the record reflects that Lindquist had experience with substance abuse through family members’ addictions and had connections with law enforcement, the record does not support Hernandez’s claim that her background and her responses during voir dire raised a reasonable doubt about her impartiality.
With regard to questions about how substance abuse and alcohol abuse had impacted her life, Lindquist indicated that it had affected her life in “numerous ways through numerous family members.” Lind-quist explained that her first husband’s abuse of marijuana caused her first marriage to end. She also explained that her oldest son had been addicted to marijuana and that she had two cousins with substance abuse issues, which caused stress on the family. Lindquist also stated that her ex-brother-in-law’s fiancée had a substance abuse problem and overdosed and died. However, when the States asked, “Do you think if drug addiction or the use of drugs becomes an issue in this case that, that you can put aside you family’s involvement with substance abuse, and base your verdict solely on the evidence and the law in this trial?” Lindquist responded, “Yes, *660 I do.” Furthermore, when asked by defense counsel about whether the ingestion of alcohol or cocaine could rise to the level of a mitigating factor in her mind, Lind-quist responded affirmatively. In sum, while Lindquist indicated that her life had been affected by substance abuse, she did not give an equivocal response about her ability to base her verdict solely on the evidence and law, and she never indicated that her experience would play a role in how she decided the case.
With regard to her connections with law enforcement, Lindquist indicated that she was a probation office supervisor for the Department of Juvenile Justice (DJJ) of Santa Rosa County. As Hernandez concedes, this fact, alone, would be insufficient grounds for a cause challenge. Cf. Busby, 894 So.2d at 95 (explaining that the mere fact that someone is a correctional officer is not per se grounds for a challenge for cause).
Lindquist also agreed with the State’s assertion that she knew a lot of people in law enforcement. For example, she said that she was engaged to a former deputy and law enforcement officer in the Air Force, who was employed with the DJJ. She said that she knew three people in law enforcement personally and between fifty-five and sixty individuals professionally in Escambia and Santa Rosa Counties. Among those people, she said that she knew Detective Shuler, one of the investigators in Hernandez’s case who later testified at the trial. She said that she had worked with him approximately five times in the previous ten years, mostly over the phone. She unequivocally stated that her knowledge of him would not prohibit her from being fair and impartial in a case where he was the case agent, that she could weigh his credibility the same as any other witness, and that she did not know anything about him that would give her reason to give him more credibility.
Significantly, the State also asked her if her knowledge of persons in law enforcement or her work would prejudice her in any way in deciding the case. She responded, “I don’t believe so.” The State then asked, “Can you assure Mr. Hernandez that you can listen to the evidence in this case and the law that the judge instructs, and base your verdict solely on the evidence and the law?” Lindquist responded:
Yes, I can. I work for a neutral agency, and we work with all parties involved. But we are very neutral. We don’t work for the Public Defender, the State Attorney or law enforcement. And we look at the totality of the big picture. And I am also a Quality Assurance Reviewer for the Department of Juvenile Justice. And I review our policy and procedure on that, as well as a Regional Administrative Review Liaison from Tallahassee with the Department of Juvenile Justice. So I look at facts.
Although Lindquist initially responded, “I believe so,” rather than responding “Yes” to the question of whether her employment and knowledge of persons in law enforcement would prejudice her in deciding the case, this response was not equivocal enough, in light of the entirety of her questioning, ' to generate a reasonable doubt about her fitness as a juror. As this Court explained in Busby, “The mere fact that a juror gives equivocal responses does not disqualify that juror for service.... ‘In evaluating a juror’s qualifications, the trial judge should evaluate all of the questions and answers posed to or received from the juror.’ ” 894 So.2d at 96 (quoting Parker v. State, 641 So.2d 369, 373 (Fla.1994)). Lindquist gave unequivocal responses to other questions regarding her possible prejudices and biases and regarding her *661 understanding of and ability to follow the law. A review of the entirety of her voir dire supports the court’s denial of the cause challenge.
Accordingly, we find that the trial court did not err in denying Hernandez’s challenge for cause to juror Lindquist.
WITNESS’S EXEMPTION FROM SEQUESTRATION
Hernandez argues that the trial court erred by excusing the State’s mental health expert from the rule of sequestration and allowing the expert to remain through the presentation of lay and expert testimony during the penalty phase of his trial. Hernandez asserts that this error unfairly allowed the State’s expert to specifically tailor his testimony to do the most damage to Hernandez’s case. Hernandez argues that the trial court abused its discretion and that the court’s error was inherently prejudicial.
At the beginning of his trial, Hernandez invoked the rule of sequestration. Then, after the presentation of victim impact evidence during the penalty phase, the State requested that Dr. Harry McClaren, a licensed forensic psychologist who was appointed by the court as the State’s mental health expert before trial and who examined Hernandez after the jury returned a guilty verdict, remain in the courtroom during the presentation of evidence by the State and defense:
MR. ELMORE [prosecutor]: Judge, the State has — as the Court is aware, has secured the services of Doctor Harry McClaren, a licensed forensic psychologist for possible rebuttal testimony in this ease. He has requested of me leave of the Court to sit in on the information that comes before the Court from this point forward concerning Michael Albert Hernandez, Junior.
THE COURT: He’s an expert. Do you have any problem with that?
MR. ROLLO [defense counsel]: I think he’s entitled to sit through the presentation of our experts, but I don’t know that he can gather facts that go into — that help him base his opinion on whatever their rebuttal opinion is, which by the way I haven’t had a chance to talk to him about. Based on the factual presentation of evidence expert opinion is one thing and fact witnesses I think are another.
THE COURT: Are you objecting?
MR. ROLLO: I am.
MR. ELMORE: Judge, the factual witnesses, such as the State’s aggravating evidence, as well as the background evidence that will be presented concerning the defendant, are the very type things that a psychologist bases their expert opinion on. And that’s why he’s asked to be allowed to—
THE COURT: Either of you have any law on this? Do you think it’s discretionary?
MR. ELMORE: Judge, the law is that it’s discretionary with the Court.
THE COURT: I think it’s discretionary. He’s an expert and subject to cross. I’ll permit it.
Dr. McClaren stayed in the courtroom during the penalty phase and testified.
The practice of sequestering witnesses has been used for centuries, and it came to the United States as part of our inheritance of the common law. See 6 John Henry Wigmore, Evidence in Trials at Common Law § 1837, at 455-56 (James H. Chadbourn rev., 1976). The United States Supreme Court has described its purpose as two-fold: “It exercises a restraint on witnesses ‘tailoring’ their testimony to that of earlier witnesses; and it aids in detecting testimony that is less than candid.” *662 Geders v. United States, 425 U.S. 80, 87, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); see also Knight v. State, 746 So.2d 423, 430 (Fla.1998) (“The purpose of the rule of sequestration is ‘to avoid a witness coloring his or her testimony by hearing the testimony of another,’ thereby discouraging ‘fabrication, inaccuracy and collusion.’ ” (quoting Charles W. Ehrhardt, Florida Evidence § 616.1, at 506 (1998 ed.))).
Under the common law, this Court emphasized the discretionary nature of the trial court’s decision to exclude witnesses from the rule of sequestration. See, e.g., Randolph v. State, 463 So.2d 186, 191 (Fla. 1984) (“The trial judge is endowed with a sound judicial discretion to decide whether particular prospective witnesses should be excluded from the sequestration rule.”). Thus, while recognizing that some cases had approved an exception for expert witnesses from the general rule of sequestration, we held that the exception of an expert witness from the rule was a matter within the trial court’s discretion. See McVeigh v. State, 73 So.2d 694, 696 (Fla. 1954). Moreover, we applied an abuse of discretion standard when reviewing a trial court’s decision to exempt a witness from the rule. See, e.g., Spencer v. State, 133 So.2d 729, 731 (Fla.1961) (“Unless a trial judge can be said to have abused the discretion which is his to exercise in such situations, then his judgment will not be disturbed.”). Furthermore, we placed the burden on the complaining party to demonstrate an abuse of discretion with resultant injury. See, e.g., id.
In Burns v. State, 609 So.2d 600 (Fla. 1992), we addressed the exemption of the State’s mental health expert witness under the common law. In Bums, the trial court first ruled that the State’s psychologist would be allowed to remain in the courtroom during testimony by the defendant and the defense’s psychologist, and the trial court later ruled that the experts for both the State and the defense would be allowed to remain in the courtroom for the entire penalty phase of the defendant’s capital trial. Id. at 606. The trial court determined that these exemptions from the rule of sequestration were necessary because it had determined that the defendant was not required to submit to an examination by the State’s expert. Id. We held that because “this was the only avenue available for the state to offer meaningful expert testimony to rebut the defense’s evidence of mental mitigation,” the trial court did not abuse its discretion in exempting the expert witnesses from the rule. Id.[11]
In 1990 (before we decided Bums but apparently after the case was tried), the Florida Legislature codified the rule of sequestration in section 90.616, Florida Statutes. See ch. 90-174, § 2, at 743, Laws of Fla. Section 90.616, Florida Statutes (2006), states in pertinent part:
(1) At the request of a party the court shall order, or upon its own motion the court may order, witnesses excluded from a proceeding so that they cannot hear the testimony of other witnesses except as provided in subsection (2).
§ 90.616(1), Fla. Stat. (2006). While our decisions under the common law emphasized the discretionary nature of the decision to sequester witnesses, section 90.616 adopts the view that sequestration is de- *663 mandable as a matter of right. Charles W. Ehrhardt, Florida Evidence § 616.1, at 655 (2008 ed.). Nevertheless, the codified rule of sequestration also includes categories of witnesses who may not be excluded. See § 90.616(2), Fla. Stat. (2006). As one of those categories, section 90.616(2)(c) provides that a court may not exclude “[a] person whose presence is shown by the party’s attorney to be essential to the presentation of the party’s cause.” § 90.616(2)(c), Fla. Stat. (2006).
We have recognized that in applying the exception in section 90.616(2)(c) for those persons whose presence is shown to be essential to the presentation of the cause of one of the parties, “the trial court ‘has wide discretion in determining which witnesses are essential.’ ” Knight, 746 So.2d at 430 (quoting Charles W. Ehrhardt, Florida Evidence § 616.1, at 509 (1998 ed.)); see also Strausser v. State, 682 So.2d 539, 541 (Fla.1996) (citing § 90.616(2)(c) and finding no abuse of discretion in allowing the mental health expert to remain present in the courtroom while the defendant testified). Under section 90.616(2)(c), the burden is on the party seeking to avoid sequestration of a witness to demonstrate why the presence of the witness is essential.
In Strausser, we addressed the exemption of the State’s mental health expert witness under the codified rule. In Strausser, the defense attempted to show that the defendant was insane at the time of the murder, and the trial court permitted the State’s mental health expert to remain in the courtroom to hear the defendant’s testimony. 682 So.2d at 540-41. We reasoned that because a main issue in Strausser was the sanity of the defendant at the time of the crime, the trial court may have reasonably concluded that the expert’s presence during the defendant’s testimony was “essential to the presentation of the ... cause.” Id. at 541 (quoting § 90.616(2)(c), Fla. Stat. (1993)). We also noted that the State’s expert was only present for the direct examination of the defendant. Id. Thus, we held that there was no abuse of discretion. Id.
Hernandez argues that because the State did not demonstrate a need for Dr. McClaren to sit through the entire penalty phase, his case is distinguishable from Bums and Strausser. However, we need not resolve that issue, because we conclude that any error did not result in prejudice to Hernandez.
Hernandez contends that the State bears the burden of proving that prejudice did not result from the trial court’s ruling. He contends that this Court should use the harmless-error analysis under State v. DiGuilio, 491 So.2d 1129 (Fla.1986), which places the burden on the State to prove beyond a reasonable doubt that the error complained of did not contribute to the outcome.. See id. at 1135. Hernandez also relies on federal case law interpreting Federal Rule of Evidence 615, the federal codification of the rule of sequestration, to argue that the prosecution has the burden to show that the accused was not prejudiced by the witness’s exception from the rule of sequestration.[12]
*664 Accepting appellant’s contention that we should apply the harmless-error test of DiGuilio, we conclude that Hernandez was not prejudiced by the trial court’s decision to allow Dr. McClaren to remain in the courtroom during the penalty phase. Importantly, Dr. McClaren did not directly rebut any factual assertions made by lay witnesses during the penalty phase, including the abuse Hernandez suffered as a child or his history of drug abuse. In fact, Dr. McClaren acknowledged the abuse endured by Hernandez as a child and Hernandez’s extensive history of substance abuse. Furthermore, his testimony correlated with that of the other experts regarding Hernandez’s diagnoses, the tests administered, and Hernandez’s past. Moreover, while his testimony correlated with the other experts’ testimony regarding these matters, there is no indication that his expert opinion was based upon the other experts’ testimony. Dr. McClaren’s testimony mainly differed from the testimony of the other experts with regard to the mental mitigators. He disagreed with Drs. Bingham and Turner on whether Hernandez’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. Dr. McClaren also disagreed with Dr. Turner regarding whether the crime was committed while Hernandez was under the influence of extreme mental or emotional disturbance.
While Dr. McClaren’s testimony may have differed from the other experts’ testimony regarding the existence of mental mitigators, the jury was aware that this difference was solely the result of a difference in professional opinion rather than a disagreement with any of the factual circumstances related to the case or appellant’s life. For example, on cross-examination, the following exchange occurred:
Q [defense counsel] No. And just as you said, all of those factors, a person can be suffering from multiple mental disorders, disabilities, brain trauma, PTSD, and a person can know the difference between right and wrong. But similarly a person could not. And you just happen to disagree in this case, right?
A [Dr. McClaren] Yes, I do.
Q But that’s your professional opinion. Your professional opinion is that you disagree. Not that it is impossible that Michael Hernandez was in fact meeting the statutory criteria. You disagree professionally with Drs. Bingham and Turner?
A Absolutely. Yes.
Furthermore, the jury was aware at all times that Dr. McClaren had listened to the testimony of the other witnesses during the penalty phase. On both direct and cross-examination, Dr. McClaren explained that he listened to testimony of the witnesses during the penalty phase, including Hernandez’s mother, half-brother, and wife. Further, defense counsel was free at all times to explore this fact with Dr. McClaren during cross-examination and there is no suggestion on appeal that defense counsel was limited in any way during this examination.
In sum, Dr. McClaren did not refute the factual testimony of the witnesses during the penalty phase and admitted that he had observed the testimony of other witnesses during the penalty phase. Only his professional opinions differed from those of the defense expert witnesses. Further, there is no suggestion that either his opinions or the factual predicates upon which *665 those opinions were based would have been different if he had not been allowed direct access to the other testimony elicited during the penalty phase. In fact, Dr. McClaren was presented with a view of the defendant’s background that the defense itself relied upon for its case in mitigation. Therefore, we conclude that Dr. McClaren’s presence throughout the penalty phase was harmless beyond a reasonable doubt.
FAILURE TO DISMISS THE INDICTMENT
Hernandez next argues that the trial court erred in failing to dismiss the indictment.
Before trial, Hernandez filed a motion to dismiss with prejudice the indictment filed against him. Hernandez argued that the United States Supreme Court’s decisions in Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), required the aggravators to be alleged in the indictment and proven beyond a reasonable doubt. Because the State had not alleged the aggravating circumstances, Hernandez argued that the indictment should be dismissed. In the alternative, Hernandez requested an order requiring the jury to make unanimous findings of fact with respect to each aggravator and to indicate those unanimous findings on a special interrogatory verdict form. The trial court denied this motion.
We have repeatedly rejected the argument that aggravating circumstances must be alleged in the indictment. See, e.g., Coday v. State, 946 So.2d 988, 1006 (Fla. 2006) (rejecting the defendant’s argument that the failure to allege the aggravating circumstances in the indictment renders a sentence unconstitutional under Ring); Ibar v. State, 938 So.2d 451, 473 (Fla.2006) (noting that the defendant’s claim that the indictment was defective because it did not provide notice of the aggravators had been addressed adversely to the defendant); Blackwelder v. State, 851 So.2d 650, 654 (Fla.2003) (observing that this Court had rejected the argument that aggravating circumstances must be alleged in the indictment); Kannondy v. State, 845 So.2d 41, 54 (Fla.2003) (explaining that Ring does not require notice of the aggravating factors that the State will present).
Similarly, we have also rejected Hernandez’s alternative argument that a special verdict form indicating the aggravating factors found by the jury should have been used. See, e.g., Ibar, 938 So.2d at 473 (noting that the defendant’s claim that the verdict forms should have indicated which aggravators the jury found had been addressed adversely to the defendant); Kormondy, 845 So.2d at 54 (observing that Ring does not require a special verdict form indicating the aggravating factors found by the jury).
We have not receded from these decisions, and we do not recede from them now. Accordingly, we find no error.
INSTRUCTION ON VICTIM IMPACT EVIDENCE
Hernandez argues that the trial court erred in giving the jury instruction on victim impact evidence approved by this Court in Kearse v. State, 770 So.2d 1119, 1132-33 (Fla.2000), and Rimmer v. State, 825 So.2d 304, 330-31 (Fla.2002). He argues that the instruction is confusing, and he requests this Court to reconsider its opinions in Kearse and Rimmer.
At a charge conference hearing before the penalty phase, the State requested that the trial court give the victim impact *666 evidence instruction approved in Kearse. Over defense objection, the court ruled that it would give the approved language from Kearse. Thus, after each of the two victim impact evidence witnesses testified, the court gave the following instruction:
Ladies and gentlemen, you’ve heard evidence that concerns the uniqueness of Ruth Winslow Everett as an individual human being and the result and loss to the community’s members by Ruth Win-slow Everett’s death. Family members are unique to each other by reason of their relationship and role each has in the family. A loss to the family is a loss to both the community of the family and to the larger community outside of the family.
While such evidence is not to be considered in establishing either an aggravating circumstance or a mitigating circumstance, you may still consider it as evidence in this case.
The instruction given by the trial court tracks the instruction used by the trial court in Kearse. See Kearse, 770 So.2d at 1132. Thus, just like the instruction in Kearse, this instruction mirrors the language of the statute, see § 921.141(7), Fla. Stat. (2004) (“Such evidence shall be designed to demonstrate the victim’s uniqueness as an individual human being and the resultant loss to the community’s members by the victim’s death.”), and comports with our explanation of the limits of victim impact evidence. See Bonifay v. State, 680 So.2d 413, 419-20 (Fla.1996) (“Clearly, the boundaries of relevance under the statute include evidence concerning the impact to family members. Family members are unique to each other by reason of the relationship and the role each has in the family. A loss to the family is a loss to both the community of the family and to the larger community outside the family.”); Windom v. State, 656 So.2d 432, 438 (Fla. 1995) (“Victim impact evidence must be limited to that which is relevant as specified in section 921.141(7).”). ' Moreover, it helped to guide the jury’s consideration of the victim impact evidence. See Kearse, 770 So.2d at 1133.
Furthermore, we have approved similar instructions in other cases. See, e.g., Hoskins v. State, 965 So.2d 1, 13-14 (Fla.2007) (approving the trial court’s instruction to the jury that victim impact evidence “ ‘may be considered by you to determine the victim’s uniqueness as an individual human being and the resultant loss to the community’s members by the victims death,’ but that ‘the law does not allow you to reweigh this evidence as an aggravating circumstance’ ”); Rimmer, 825 So.2d at 331 (approving an instruction that victim impact evidence “should not be considered by you as evidence of an aggravating circumstance or rebuttal of mitigating circumstances,” but “may be considered to demonstrate the victim[’]s uniqueness as an individual human being and the resultant loss to the community’s members by the victim[’]s death”); Farina v. State, 801 So.2d 44, 53 (Fla.2001) (approving an instruction in which “[t]he jury was instructed that the evidence could not be considered an aggravating circumstance, but should only be considered ‘insofar as it demonstrates [the victim’s] uniqueness as an individual human being and the result of loss to the community and its members by her death’ ”); Alston v. State, 723 So.2d 148, 160 (Fla.1998) (approving an instruction that “you shall not consider the victim impact evidence as an aggravating circumstance, but the victim impact evidence may be considered by you in making your decision in this matter”).
Accordingly, we reject Hernandez’s claim.
*667 AVOID ARREST AGGRAVATOR
Hernandez argues that the trial court erred in finding that he committed the murder for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. Hernandez contends that facts before and after the murder indicate that the dominant motive, or at least an equally dominant motive, in killing Ruth Everett was not to avoid lawful arrest by eliminating her as a witness, it was to steal money so that he and Arnold could buy more crack cocaine.
“In reviewing an aggravating factor challenged on appeal, this Court’s task ‘is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance, and, if so, whether competent substantial evidence supports its finding.’ ” Douglas v. State, 878 So.2d 1246, 1260-61 (Fla.2004) (quoting Willacy v. State, 696 So.2d 693, 695 (Fla.1997)).
We have held that “[t]o establish the avoid arrest aggravating factor where the victim is not a law enforcement officer, the State must show beyond a reasonable doubt that the sole or dominant motive for the murder was the elimination of a witness.” Connor v. State, 803 So.2d 598, 610 (Fla.2001) (citing Alston, 723 So.2d at 160). In such cases, proof of the intent to avoid arrest or detection must be very strong. Riley v. State, 366 So.2d 19, 22 (Fla.1978). We have explained that “[m]ere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator.” Consalvo v. State, 697 So.2d 805, 819 (Fla.1996) (citing Scull v. State, 533 So.2d 1137, 1142 (Fla.1988)).
We have upheld the finding of this ag-gravator in cases in which the defendant expressed an apprehension regarding arrest or made incriminating statements about eliminating witnesses. See, e.g., Bevel, 983 So.2d at 519 (finding the aggra-vator applicable where the defendant told his girlfriend and police that he only killed the victim because he would have been a witness); Reynolds v. State, 934 So.2d 1128, 1157-58 (Fla.2006) (holding the ag-gravator applicable where the defendant admitted killing the victims and told a friend “with my record I can’t afford to leave any witnesses”); Trease v. State, 768 So.2d 1050, 1056 (Fla.2000) (finding the aggravator justified where the defendant told his codefendant that he killed the victim because the victim could identify them); Walls v. State, 641 So.2d 381, 390 (Fla.1994) (concluding that the aggravator existed where the defendant confessed that he killed the victim because he wanted no witnesses).
While in some cases this Court has approved the finding of the avoid arrest aggravator based on admissions of the defendant, in other cases this Court has approved the finding based on circumstantial evidence, without any direct statements by the defendant indicating a motive to eliminate witnesses. Swafford v. State, 533 So.2d 270, 276 (Fla.1988). We have explained that “[e]ven without direct evidence of the offender’s thought processes, the arrest avoidance aggravator can be supported by circumstantial evidence through inference from the facts shown.” Id. at 276 n. 6. For example, when reviewing this aggravator in other cases, we have looked to whether the victim knew and could identify the killer and “whether the defendant used gloves, wore a mask, or made incriminating statements about witness elimination; whether the victims offered resistance; and whether the victims were confined or were in a position to pose a threat to the defendant.” Farina, 801 So.2d at 54.
*668 In finding that this aggravating circumstance had been proven beyond a reasonable doubt, the trial court explained:
This factor properly exists if the dominant motive of the murder was to eliminate a witness. Walls v. State, 641 So.2d 381 (Fla.1994). Other than Defendant, the co-defendant, and the victim, there were no witnesses to the murder. During a jail visit Defendant admitted to Ms. Daveine Hartman that he intentionally twisted and broke the victim’s neck after his and the co-defendant’s failed attempt to immobilize and suffocate her. He admitted both to Ms. Hartman and to police that he later slashed the victim’s throat. His reason for doing so, as relayed by Ms. Hartman, was because the victim had seen his and the co-defendant’s faces. Furthermore, the murder consisted of a series of progressively bi’utal attacks because, as Defendant explained, the victim would not die. The Court finds that Defendant’s dominant motive for the murder was to eliminate the victim as a witness to the burglary and robbery. The Court attaches great weight to this aggravating circumstance.
The State notes that in finding the avoid arrest aggravator the trial court explicitly relied on Tammy Hartman’s testimony, including her statement that Hernandez told her that he killed the victim and cut her throat “[bjecause she’d seen their faces.” While Hernandez may not have explicitly told Tammy that he killed the victim to eliminate her as a witness to the robbery and burglary, this statement suggests that his dominant motive was witness elimination. The fact that the trial court relied on Tammy’s testimony in its findings is significant in light of the trial court's superior vantage point to assess Tammy’s credibility. See Reynolds, 934 So.2d at 1158 (“The trial court is in the best position to assess the credibility of a witness, and we are mindful to accord the appropriate deference to the trial court’s assessment of this witness’s testimony in our review of whether competent, substantial evidence exists to support this statutory aggravator.”). Moreover, as the trial court noted, the murder consisted of a series of progressively brutal attacks because the victim “would not die.” The record indicates that the last of these attacks, the cutting of the victim’s neck, likely occurred when the victim was already physically incapacitated. If the victim was already immobilized when Hernandez cut her neck, then he would not have needed to cut her neck to steal from her. Such facts belie Hernandez’s argument that the dominant motive for the murder, or an equally dominant motive, was to accomplish the robbery and burglary.
Accordingly, we conclude that competent, substantial evidence supports the trial court’s finding of the avoid arrest aggra-vator.
HAC AGGRAVATOR
Hernandez contends that because the evidence was inconclusive of whether Ruth Everett was conscious after her neck was broken and aware of her impending death for any appreciable time, the trial court erred in finding that the murder was especially heinous, atrocious, or cruel.
We have explained the meaning of the HAC aggravator as follows:
It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by *669 such additional acts as to set the crime apart from the norm of capital felonies— the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
State v. Dixon, 283 So.2d 1, 9 (Fla.1973). We have also stated that “[u]nlike the cold, calculated and premeditated aggravator, which pertains specifically to the state of mind, intent and motivation of the defendant, the HAC aggravator focuses on the means and manner in which death is inflicted and the immediate circumstances surrounding the death.” Brown v. State, 721 So.2d 274, 277 (Fla.1998) (citing Stano v. State, 460 So.2d 890, 893 (Fla.1984)).
Furthermore, we have held that “[i]n determining whether the HAC factor was present, the focus should be upon the victim’s perceptions of the circumstances as opposed to those of the perpetrator.” Lynch v. State, 841 So.2d 362, 369 (Fla.2003). The victim’s mental state may be evaluated in accordance with common-sense inferences from the circumstances. Swafford, 533 So.2d at 277 (citing Preston v. State, 444 So.2d 939, 946 (Fla. 1984)). We have also held that to support this aggravator, the evidence must demonstrate that the victim was conscious and aware of impending death. Douglas, 878 So.2d at 1261. However, we have explained that the actual length of the victim’s consciousness is not the only factor relevant to this aggravating circumstance. Beasley v. State, 774 So.2d 649, 669 (Fla. 2000). “[F]ear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel.” James v. State, 695 So.2d 1229, 1235 (Fla.1997). We have further held that the actions of the defendant preceding the actual killing are also relevant. Gore v. State, 706 So.2d 1328, 1335 (Fla.1997) (citing Swafford, 533 So.2d at 277, and Smith v. State, 424 So.2d 726, 733 (Fla. 1982)).
Hernandez argues that because the evidence was inconclusive regarding whether the victim was conscious when Hernandez cut her neck, the finding of the HAC ag-gravator was improper. Hernandez’s argument ignores the entire context within which the murder occurred. In finding that this aggravator had been proven beyond a reasonable doubt, the trial court detailed that context:
The victim’s attack began when she was grabbed by the head and forced into her home by Defendant. Soon after they entered the home, the co-defendant covered the victim’s face with a pillow in an attempt to suffocate her while Defendant held her arms and hands to immobilize her. At some point the victim began to hyperventilate, and the co-defendant provided her a bag in which she was allowed to breathe to calm her. Also at some point during the attacks, the victim resisted and scratched Defendant. DNA analysis revealed that DNA found under the victim’s fingernails partially matched Defendant’s DNA profile. The photographs of the victim reveal that her nose, lips, and eyes contained large dark bruises which indicated that extreme force was used against her when she was grabbed by the face, or during the attempted suffocation, or both.
Unable to quickly and easily suffocate the victim — and after the co-defendant expressed his reluctance to complete the murder — Defendant then intentionally twisted the victim’s neck with a two-handed grip. He later demonstrated the motion to Ms. Hartman, who tearfully demonstrated it to the jury. According to Dr. Andrea Minyard, the medical examiner, the victim was alive, likely paralyzed, and possibly conscious when *670 Defendant stabbed her neck with a small pocket knife, dragging it several inches along the victim’s neck. Dr. Min-yard could neither rule out nor confirm whether the victim could feel pain associated with the neck wound. The victim bled profusely, which indicated that her heart was beating when she was stabbed. According to Defendant’s own words, the attacks were prolonged because the victim would not die. The Court attaches great weight to this aggravating circumstance.
Moreover, this Court’s case law does not support his argument. For example, in Lott v. State, 695 So.2d 1239 (Fla.1997), the defendant argued that because the victim may have been unconscious at the time of the fatal attack, the HAC aggravator was not proven beyond a reasonable doubt. Id. at 1244. In finding the HAC aggravator, the trial court’s sentencing order detailed the relevant facts:
Based on the evidence, this crime occurred over a period of time. From the minute Defendant entered the home until the victim was choked into unconsciousness (hopefully), she suffered unspeakable humiliation, terror, and pain. She was so afraid she defecated on herself, her panties with feces on them were removed in one bedroom, she was completely nude and died in the master bedroom. Her mouth, wrist, and ankles were taped making her totally defenseless. Plier marks were on her arm. The State suggests the pliers were used to get her to tell her attacker(s) her ATM number. That is a reasonable possibility and perhaps the least onerous. There is no way of knowing how long this torturous assault lasted, but common sense dictates that it could not have been brief. Once the Defendant got everything he needed from [the victim], he deliberately slashed her throat, and to be sure she was dead, he stabbed her in the back. These acts were definitely conscienceless, pitiless, and unnecessarily torturous.
Id. We rejected the defendant’s argument on appeal, explaining that “[although [the victim] may not have been conscious at the time that Lott made the fatal slash which caused her death, the physical torture and emotional trauma she suffered during the time leading up to her death justify application of the HAC aggravator.” Id.
Similarly, in Beasley, the defendant argued that the murder was not especially heinous, atrocious, or cruel because the victim may have been rendered unconscious shortly after the defendant began attacking her with a hammer. 774 So.2d at 669. We upheld the finding of the aggravator and noted that evidence of the victim’s numerous defensive wounds from fending off blows from the hammer belied the defendant’s argument that the victim may have been rendered unconscious before she suffered pain. Id. at 670-71.
The facts of this case are similar to the facts of Lott and Beasley. For instance, like the victim in Lott, the victim in this case physically manifested her fear; specifically, Ruth began hyperventilating when Hernandez and Arnold smothered her with the pillow. Moreover, like the victim in Beasley, the victim struggled to defend herself against her attacker. Ruth first struggled when Hernandez and Arnold smothered her with the pillow, and she again grabbed and scratched at Hernandez before he broke her neck. These responses suggest that Ruth was aware of her impending death and indicate the fear, emotional strain, and terror that she endured before Hernandez broke her neck and cut her throat.
In sum, regardless of whether Ruth was conscious when Hernandez cut her throat, the defendant’s actions and words and the *671 victim’s physical responses to the series of attacks preceding this final act provide competent, substantial evidence to support the trial court’s finding of the HAC aggra-vator. Thus, we conclude that the trial court did not err in finding that the murder was especially heinous, atrocious, or cruel.
PROPORTIONALITY
Disparate Sentences
Hernandez argues that the trial court erred in sentencing him to death because his codefendant, Christopher Shawn Arnold, was equally culpable but was sentenced to life in prison without the possibility of parole after pleading nolo contendere to felony murder with a deadly weapon. Hernandez contends that because they were equally culpable but received disparate sentences, his death sentence is constitutionally disproportionate.
“When a codefendant is equally as culpable or more culpable than the defendant, the disparate treatment of the codefendant may render the defendant’s punishment disproportionate.” Sexton v. State, 775 So.2d 923, 935 (Fla.2000). If, however, “the circumstances indicate that the defendant is more culpable than a co-defendant, disparate treatment is not impermissible despite the fact the codefen-dant received a lighter sentence for his participation in the same crime.” Brown, 721 So.2d at 282. “A trial court’s determination concerning the relative culpability of the co-perpetrators in a first-degree murder case is a finding of fact and will be sustained on review if supported by competent substantial evidence.” Puccio v. State, 701 So.2d 858, 860 (Fla.1997). Although the trial court may not have specifically stated that Hernandez was more culpable than Arnold, the trial court clearly considered and rejected Hernandez’s argument of equal culpability by giving no weight to this mitigating factor offered by Hernandez. In its sentencing order, the court explained:
While both Defendant and the co-defendant are responsible for the victim’s death, Defendant, himself admitted that his hands broke the victim’s neck and held the knife that slashed her neck. Subsequently, when Defendant spoke to Ms. Hartman during a jail visit, he indicated that co-defendant could not complete the murder. While the Court recognizes that disparate treatment does exist in this case, the treatment is justified. The disparate treatment does not mitigate the offense and is given no weight.
Although the record reveals that Arnold was a participant in the crimes, it does not support Hernandez’s claim that Arnold was equally culpable in the victim’s murder. While Arnold may have had the original idea for going to the Everett house for crack cocaine or money, may have encouraged and actively participated in the robbery and burglary, and may have inflicted nonfatal injuries to the victim by smothering her with a pillow with Hernandez’s assistance, the record reflects that Hernandez, not Arnold, inflicted the fatal injuries by breaking the victim’s neck and slashing her throat. Moreover, the record suggests that after attempting to suffocate the victim, Arnold expressed reluctance to complete the attack and gave the victim a bag to breathe in to calm her down. The record further reflects that Hernandez consequently pushed Arnold aside and then broke the victim’s neck and cut her throat.
Given that Hernandez actually inflicted the fatal injuries, this case is similar to other cases in which we have found a defendant’s death sentence to be proportionate even though the codefendant re *672 ceived a lesser sentence but was actively involved in the victim’s murder. See, e.g., White v. State, 817 So.2d 799, 801-02, 809-11 (Fla.2002) (finding the defendant’s death sentence proportionate where the defendant delivered the fatal stab wounds to the victim after his codefendant suggested they teach the victim a lesson and they beat her, drove her to the end of a deserted road, and pulled her out of the car and passed her over a barbed wire fence before killing her); Brooks v. State, 918 So.2d 181, 186-87, 208-10 (Fla.2005) (holding that the defendant’s death sentence was proportionate where the defendant was the “knifeman” in the planned attack on the codefendant’s paramour and her infant daughter); Hannon v. State, 638 So.2d 39, 41, 44 (Fla.1994) (concluding that the defendant was more culpable and his death sentence was justified where he delivered the fatal blow to one of the victims, after his codefendant had stopped stabbing the victim, and where he shot the other victim); cf. Colina v. State, 634 So.2d 1077, 1078, 1082 (Fla.1994) (agreeing with the trial court that the codefendant’s participation was lesser where the codefen-dant hit one of the victims only once and the defendant was responsible for the lethal blows that killed both victims).
Hernandez essentially argues that because Arnold’s culpability is similar to the culpability of defendants in cases where we have found the death penalty to be proportionate and is dissimilar to the culpability of defendants in cases where we have found the death penalty to be disproportionate, Arnold is equally culpable to Hernandez. Hernandez also argues that Arnold’s culpability is similar to the culpability of the defendants in Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), in which the United States Supreme Court held that a death sentence may be proportionate if the defendant was a major participant in the felony and the defendant’s state of mind amounted to a reckless indifference to human life. See id. at 158, 107 S.Ct. 1676. As the State correctly observes, the cases Hernandez cites are inapposite. None of these cases address the issue of the proportionality of a defendant’s sentence when a codefendant received a life sentence.
Because the record contains competent, substantial evidence to support the conclusion that Hernandez was more culpable than Arnold, we find that the trial court did not err in imposing a death sentence on Hernandez even though Arnold received a life sentence.
Comparison to Other Cases
While Hernandez challenges the proportionality of his sentence in light of his argument regarding disparate sentencing of his codefendant, he does not otherwise challenge the proportionality of his sentence. Nevertheless, “[t]his Court must review the proportionality of a death sentence, even if the issue has not been raised by the defendant.” Walker v. State, 957 So.2d 560, 585 (FIa.2007) (quoting Bolin v. State, 869 So.2d 1196, 1204 (Fla. 2004)); see also Fla. R.App. P. 9.142(a)(6). The purpose of this Court’s proportionality review is to “foster uniformity in death-penalty law.” Tillman v. State, 591 So.2d 167, 169 (Fla.1991). Proportionality review is a consideration of the totality of the circumstances in a case in comparison with other capital cases. Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). It entails a “qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.” Urbin v. State, 714 So.2d 411, 416 (Fla.1998).
The jury voted eleven to one to recommend death, and in sentencing Hernandez to death, the court gave great weight to *673 the jury’s recommendation. The trial court found four aggravating factors and assigned great weight to each: Hernandez was previously convicted of violent felonies; Hernandez committed the murder during the course of a robbery and burglary; Hernandez committed the murder to avoid arrest; and the murder was especially heinous, atrocious, or cruel. While the court found only one statutory mitigator, no significant history of prior criminal activity, and assigned it some weight, the court found multiple nonstatutory mitigating circumstances, including several to which the court assigned substantial weight.[13] The trial court found that “[although mitigating circumstances exist in this case, the serious aggravating circumstances which have been proven beyond a reasonable doubt greatly outweigh the mitigating circumstances.”
We have upheld death sentences in cases involving similar aggravating and mitigating circumstances. See, e.g., Guardado v. State, 965 So.2d 108, 110-12 & n. 2, 119 (Fla.2007) (finding the death penalty proportionate where the defendant beat and stabbed an elderly woman in an effort to obtain money to continue his crack cocaine binge, and the trial court found five aggravators including prior violent felony, engaged in the commission of a robbery with a weapon, and HAC, no statutory mitigators, and nineteen nonstatutory mit-igators including that the defendant accepted responsibility, had a lengthy history of substance abuse and addiction to crack cocaine, and was sexually molested as a child); White, 817 So.2d at 801-03 & nn. 2-3, 811 (finding the death penalty proportionate where the defendant and his codefendants beat the victim, stabbed her, and slit her throat, and the trial court found four aggravators including prior violent felony, engaged in the commission of a kidnapping, avoid arrest, and HAC, one statutory mitigator, and nine nonstatutory mitigators including an abusive childhood, an extensive history of alcohol and substance abuse, organic brain damage, and alcohol intoxication at the time of the offense); Morris v. State, 811 So.2d 661, 662-65 & nn. 2-5, 669 (Fla.2002) (find the death penalty proportionate where the defendant broke into an elderly woman’s apartment, beat and strangled her, and stole her television and rare coins, and the trial court found four aggravators including prior violent felony and HAC, one statutory mitigator, and numerous non-statutory mitigators including physical and emotional abuse as a child, a mother who was a drug and alcohol abuser, witnessing the physical and sexual abuse of his mother and sisters, an absent father, learning disabilities as a child, lifelong addiction problems, and loving relationships with his family).
Considering the totality of the circumstances, we find Hernandez’s sentence of death proportionate.
*674 CONCLUSION
Based on' the foregoing reasons, we affirm Hernandez’s convictions and sentences.
It is so ordered.
WELLS, CANADY, and POLSTON, JJ., and ANSTEAD, Senior Justice, concur.
PARIENTE, J., concurs in result only with an opinion, in which QUINCE, C.J., and LEWIS, J., concur.

. Because several individuals in this case share the same surnames, those individuals— with the exception of the defendant — will be referred to by their given names, and "Jr.” or "Sr.” will be used for further identification when necessary.

. The pillow was never recovered.

. The jury did not specify whether it found Hernandez guilty of first-degree premeditated murder or first-degree felony murder.

. On the burglary count, the jury found the following: Hernandez committed an assault or battery in the course of committing a burglary; Hernandez was armed with a dangerous weapon; and the dwelling was occupied by Ruth Everett during the commission of the burglary.

. Cheryl testified through a videotaped deposition because she was serving a sentence in a correctional facility for killing her husband, Anthony Walker.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The court rejected the aggravating circumstance that the victim of the capital felony was particularly vulnerable due to advanced age or disability.

.The court rejected the following statutory mitigators: the crime was committed while Hernandez was under the influence of extreme mental or emotional disturbance; Hernandez's capacity to appreciate the criminality of his conduct or to conform his conduct to *655 the requirements of law was substantially impaired; Hernandez acted under extreme duress or under the substantial domination of another person; and Hernandez's age, twenty-three, at the time of the crime.

. Hernandez offered twenty-eight circumstances, and the court added the twenty-ninth circumstance. The court found the following: (1) "He lived in dysfunctional, neglectful, and impoverished childhood circumstances” (some weight); (2) "He had essentially no family home with anything normal in it; he did not have any regular schooling; his parents were separated and he was bounced from parent to parent, to abusive foster homes, and to abandonment" (substantial weight); (3) "His parents were outlaws, motorcycle gang members, hard drug dealers and abusers, who were under threat of death from the motorcycle gang” (substantial weight); (4) "His parents introduced Defendant to narcotics at an early age” (substantial weight); (5) "His mother had many live-in paramours, who were physically, mentally, and emotionally abusive to her and to Defendant” (some weight); (6) "Defendant witnessed physical abuse of mother on many occasions” (some weight); (7) "Defendant was abandoned by mother on more than several occasions and placed in foster care, where he was further mentally, physically, and emotionally abused” (substantial weight to the abandonment aspect, but no weight to the rest because it was addressed in factor (9)); (8) "Defendant’s father was overdosed by drugs at the hands of his girlfriend, while Defendant was living with him” (some weight); (9) "The Defendant was mentally, physically, emotionally, and sexually abused in foster care over a four year period as a preteen/early teen” (some weight); (10) "The Defendant ran away because of the abuse and because his mother would not come to his aid; his mother also told him goodbye, and that she was going to commit suicide” (some weight); (11) "The Defendant was dysfunctional by this time, and began to live on the streets and continue in drug usage” (some weight); (12) "The Defendant lived with his 1/2 brother for a period of time, but was subjected to continued drug exposure and use at the hands of his 1/2 brother’s father, Richard Hartman” (some weight); (13) "The Defendant attended learning disabled classes in school when he attended” (some weight); (14) "The Defendant was able to marry and supported his family for two years” (some weight); (15) "The Defendant has been characterized as a loving person, loving father and husband” (some weight); (16) "The Defendant has a life-long addiction to controlled substances due to his involuntary exposure to them at an early age” (some weight); (17) “The Defendant was enticed into binging on cocaine at the time of the instant offense by the co-Defendant” (no weight); (18) "The Defendant had been drinking the night before and was still under the influence of alcohol on the morning of the offense” (some weight); (19) "The offense was unplanned, and was initiated by the co-Defendant” (no weight); (20) "The resulting homicide was a spontaneous, unplanned act" (no weight); (21) "The co-Defendant actually took the property of the decedent in hopes of finding money or means to get money to purchase cocaine” (no weight); (22) "When confronted, the Defendant accepted responsibility for taking part in the offense” (substantial weight); (23) "The Defendant has continuously shown remorse for his conduct” (slight weight); (24) “The Defendant has cooperated with the police to resolve the offense” (some weight); (25) "The Defendant has two documented suicide attempts” (some weight); (26) “The co-Defendant was offered a life sentence and was equally culpable, and actually initiated the entire episode” (no weight); (27) "The Defendant is not worthy of the death penalty for his participation in this crime” (no weight); (28) "Defendant has other mental and cognitive disorders that do not qualify as statutory mitigating circumstances” (some weight); and (29) “Defendant’s family members have given sworn and unsworn testimony and provided letters attesting to Defendant’s good character” (some weight).

. When Hernandez challenged Lindquist for cause, he had exhausted his peremptory challenges. The trial court denied Hernandez’s challenge to Lindquist for cause and denied Hernandez’s request for an additional peremptory challenge to use on Lindquist. Thus, Lindquist served on the jury.

. After Bums was decided, we adopted Florida Rule of Criminal Procedure 3.202. See Amendments to Florida Rule of Criminal Procedure 3.220-Discovery (3.202-Expert Testimony of Mental Health Mitigation During Penalty Phase of Capital Trial), 674 So.2d 83, 84 (Fla.1995). Rule 3.202 provides that where the death penalty is sought, the court shall order that the defendant be examined by the State’s mental health expert within forty-eight hours of a capital murder conviction. Fla. R.Crim. P. 3.202(d).

. Specifically, Hernandez cites United States v. Jackson, 60 F.3d 128 (2d Cir.1995), and United States v. Farnham, 791 F.2d 331 (4th Cir.1986). In Famham, the Fourth Circuit held, "Although Rule 615 does not require that [the defendant] show prejudice, we remain bound by the harmless error rule.” 791 F.2d at 335. In Jackson, the Second Circuit held that “the burden to demonstrate lack of prejudice, or harmless error, properly falls on the party that had opposed sequestration.” 60 F.3d at 136. However, rather than using the harmless-beyond-a-reasonable-doubt standard, the Second Circuit explained, "[A] new trial is in order ‘unless it is manifestly clear from the record that the error was harmless *664 or unless the prosecution proves harmless error by a preponderance of the evidence.' " Id. at 137 (quoting United States v. Brewer, 947 F.2d 404, 411 (9th Cir.1991)).

. In brief, these mitigators included the following circumstances. Hernandez had a dysfunctional childhood, marked by, among other things, the lack of a stable home, witnessing the abuse of his mother, abandonment by his mother, physical, emotional, mental, and sexual abuse, exposure to drugs at a young age, and the death of his father from a drug overdose. Furthermore, Hernandez suffered from drug addiction for many years and suffered from it at the time of the offense and was under the influence of alcohol on the morning of the murder. Hernandez also suffered from mental and cognitive disorders, including posttraumatic stress disorder, depressive disorder, polysubstance dependence disorder, antisocial personality disorder, borderline personality disorder, impulse control disorder, cognitive disorder not otherwise specified, and possible brain damage. Hernandez also attended learning disabled classes as a child. In addition, Hernandez was a loving father and husband, who accepted responsibility for taking part in the offense and cooperated with police to resolve it.