PER CURIAM.
This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death.[1] For the reasons explained below, we affirm Phillips’s conviction and sentence.
*299 BACKGROUND
The evidence presented at Phillips’s trial revealed that on the evening of October 18, 2005, Phillips entered the parking lot of the Builder’s First Source lumber yard (“Builder’s First”) with the intent to commit a robbery. Between 8:00 and 8:30 p.m., Phillips approached an employee of Builder’s First who had just finished his shift and asked him if the shift was getting off. The employee, Mr. Long, asked Phillips whom he was waiting for, but Phillips got aggravated and asked again if the shift was getting off. Mr. Long replied that, yes, the shift was getting off. Mr. Long then got in his vehicle and left.[2]
A few minutes later, between 8:80 and 8:45, Christopher Aligada and Wilbur Sweet finished working and headed for their vehicles in the Builder’s First parking lot. Mr. Sweet testified that he was cranking his truck with a screwdriver, and when he stepped back from the truck he saw a man, whom he later positively identified as Phillips, standing there with a gun. Phillips pointed the gun at Mr. Sweet and demanded money. At first, Mr. Sweet said he did not have any money. But in fact Mr. Sweet had $3,100 with him that day, which he intended to use to purchase a car for his son.[3] When Phillips continued to point the gun at Mr. Sweet and demand money, Mr. Sweet put his hands up, and Phillips went into Mr. Sweet’s pocket and took his money and his wallet.
According to another employee who witnessed the events, when Phillips approached Mr. Sweet, Mr. Aligada began running towards them and yelling. The employee then heard two gun shots and saw Mr. Aligada fall to the ground. Mr. Sweet testified that as soon as Phillips removed the money from his pocket, Phillips turned and fired his gun two times. When Mr. Sweet saw that Phillips had shot Mr. Aligada, Mr. Sweet took off running, and Phillips began shooting at him. Phillips then jumped in Mr. Sweet’s vehicle and drove off.
Officers testified that Mr. Sweet’s abandoned vehicle was located in the middle of the road about a block away from Builder’s First. Subsequent testing of the vehicle revealed that DNA consistent with Phillips’s DNA was on the gearshift. Further, a DNA analyst testified that the possibility of finding someone in the population who had the same DNA profile as that found on the gearshift in Mr. Sweet’s truck was approximately one in two trillion Caucasians, one in 9.5 trillion African-Americans, and one in 6.1 trillion Southeastern Hispanics.[4]
A few weeks after the murder, Phillips admitted to his girlfriend, Katrina Joyce, that he robbed someone and shot someone who was trying to be a hero and stop the robbery. Phillips also told Ms. Joyce that the shooting happened in a parking lot. Ms. Joyce testified that she did not immediately contact the police, but sometime in March 2006 she called the Jacksonville Sheriffs Office and identified Phillips as someone who may have committed a crime. Ms. Joyce also agreed to meet with Phillips, ask him about what he told her, and allow the police to record the *300 conversation. Part of that recording, which was played for the jury at trial, related Phillips stating that he shot a person because “he interfered in something that didn’t concern him, he tried to play hero and prevent what was going on.” Therefore, Phillips continued, he put himself, as well as Phillips and other people, in danger. So “what happened to him had to happen. He got hit. He got shot.... And [he] wasn’t strong enough to survive.” Phillips also stated: “If I don’t shoot him, the possibility that me and the other dude got shot up, or guaranteed to go to prison the rest of our life.... He got shot twice. He tried — he got hit the first time — when you get shot the [first] time and still trying to play hero, you’re ready to go. You ready to go.” Joyce then asked Phillips if the man could have just walked away, and Phillips answered, that “[h]e could have laid his ass down or stayed where he was in his spot ... and lived to tell the story.” Joyce also asked Phillips what he. got out of all this and Phillips replied that he got some money, although he had to split it three ways and some of it got lost while he was running away.
Phillips also acknowledged to the police that he killed Mr. Aligada. In a videotaped recording, which was played for the jury, Phillips related the. details of the crime. Specifically, he stated that on the night of the murder he jumped the fence and entered the parking lot of Builder’s First near Mr. Sweet’s truck. He explained that he had seen Mr. Sweet around and knew that he kept a lot of money on him. He also knew where Mr. Sweet worked because he had followed him and discovered that he worked at the same place where Phillips was planning to get a job.[5] After he jumped the fence, he waited by Mr. Sweet’s vehicle, between the vehicle and the fence where no one could see him. Then, after the parking lot began to clear, Phillips said maybe four or five people could see him but could not get a good look at him because he was in the shadows. Then, he said, “[t]his one guy in this f-..ing truck, he know who I am, he see me when I come from around the guy’s vehicle. [He starts yelling] hey so and so and so and so and so. Then the guy I’m with ... they done moved him. So I present my firearm.” Phillips said that as he went to pull his firearm, Mr. Aligada jumped out of his truck. Then, Mr. Sweet jumped into his truck and tried to pull away. Phillips then showed Mr. Sweet his firearm, and Mr. Sweet got back out of the truck. Phillips explained that Mr. Sweet was complying, but Mr. Aligada continued to approach; so he shot him.
Throughout the interview, Phillips related several reasons for shooting Mr. Aliga-da. He first said, “[I]t was an accident. He forced me.” He also stated that he knew Mr. Aligada and that he had spoken to him a few weeks before about a job. “[B]ut he put me in a situation to where I wanted to come out on top that I wouldn’t come out if I let him prevent me from getting away. I’m on foot so I couldn’t let him stop me. He put me in a situation,” he said. Phillips reasoned that Mr. Aliga-da did not have to get out of his truck, but yet he rushed up on Phillips and tried to grab his gun. He also claimed that it was an accident because he had no intention of shooting Mr. Aligada in the upper body, but Mr. Aligada grabbed for the firearm, so he couldn’t get there.
Phillips further stated that after the shooting he pulled away and went to a back road, but his getaway driver was *301 gone. Eventually, he caught up with the driver, the driver dropped him off, and Phillips went home. Phillips said that he left town the next day and traveled to either Carolina or Georgia and that the gun he used was gone because he dismantled it and “spread it all over a state.” The detectives repeatedly asked Phillips about accomplices or an “inside man,” but Phillips insisted he acted alone. “[M]y life is over. Why would I end somebody else’s life? I already took one life,” Phillips said. “[Tjhere’s no inside man. See, I’m going to accept full responsibility for everything.”
After the videotape ended, the interviewing officer testified that neither the money nor the gun was ever recovered and that the detectives were never able to implicate any other accomplices to the crime.
On April 9, 2008, the jury rendered its verdict finding Phillips guilty of first-degree premeditated murder during the commission of a robbery, and armed robbery. After a penalty phase on April 22 and 28, 2008, the jury recommended, by a vote of seven to five, that Phillips be sentenced to death.
The trial court held a Spencer[6] hearing on June 26, 2008, and both parties presented additional evidence and argument. At the defense’s request, the Spencer hearing was reopened on August 1, 2008, and the defense presented additional evidence opposing the State’s reliance on the avoid arrest aggravator. Thereafter, on August 29, 2008, the trial court, affording “great weight” to the jury’s recommendation, sentenced Phillips to death. The trial-court found three aggravating factors: (1) Phillips was convicted of another capital felony or of a felony involving the use or threat of violence to the person on December 17, 1996, and of grand theft on February 27, 2006[7] (great weight); (2) the crime for which Phillips was to be sentenced was committed while the defendant was engaged in the commission of the crime of armed robbery (great weight); and (8) the crime for which the defendant was to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest or effecting escape from custody (great weight).
In addition, while the trial court found no statutory mitigating circumstances, it noted the following nonstatutory mitigating circumstances and assigned each a relevant weight: Phillips (1) frequently changed homes and schools as a child (slight weight); (2) suffered from childhood mental illness (slight weight); (3) suffered from adult mental illness (no weight); (4) suffered childhood learning disabilities (slight weight); (5) did not take or was not properly. administered drugs prescribed to him for childhood attention-deficit disorder (slight weight); (6) had a difficult birth (slight weight); (7) was raised in drug and crime-infested neighborhoods (slight weight); (8) was raised by a mentally ill mother (some weight); (9) was raised without any stable father figure (slight weight); (10) was.openly disfavored as a child (slight weight); (11) was deprived of food and clothing as a child (little weight); (12) suffered physical abuse as a child (some weight); (13) suffered mental abuse as a child (moderate weight); (14) suffered , the loss of a grandmother who *302 was the only adult who loved him as a child (moderate weight); (15) was raised in poverty (slight weight); (16) suffered a devastating on-the-job injury (slight weight); (17) is reverent (slight weight); (18) is trustworthy with family members (no weight); (19) is supportive of family members (no weight); (20) is protective of family members (no weight); (21) respects and helps elderly people (slight weight); (22) is kind to animals (slight weight); (23) respects the jury and the judicial system (slight weight); (24) is friendly (slight weight); and (25) is remorseful (no weight).
The trial court concluded that in this case any one of the aggravating circumstances, standing alone, would be sufficient to outweigh the mitigation and impose the sentence of death. This appeal follows.
ANALYSIS
Phillips makes the following claims on appeal: (A) the trial court erred in finding and instructing the jury on the avoid arrest aggravator; (B) the trial court erred in instructing the jury during the penalty phase; (C) the death sentence is not proportionate; and (D) the trial court erred in not either striking the jury panel or granting a new trial after some jurors observed Phillips wearing shackles, handcuffs, and a jail uniform.[8] In addition to addressing each of these claims below, we also address (E) whether the evidence was sufficient to sustain Phillips’s conviction.
A. The avoid arrest aggravator .
Phillips first claims that the trial court erred in finding and in instructing the jury on the avoid arrest aggravator. We disagree. “[I]t is not this Court’s function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt — that is the trial court’s job.” Willacy v. State, 696 So.2d 698, 695 (Fla.1997). Rather, “[i]n reviewing an aggravating factor challenged on appeal, this Court’s task ‘is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance, and, if so, whether competent substantial evidence Supports its finding.’ ” Hernandez v. State, 4 So.3d 642, 667 (Fla.2009) (quoting Douglas v. State, 878 So.2d 1246, 1260-61 (Fla.2004)). In order to establish the avoid arrest aggravator “where the victim is not a law enforcement officer, the State must show beyond a reasonable doubt that the sole or dominant motive for the murder was the elimination of a witness.” Hernandez, 4 So.3d at 667 (quoting Connor v. State, 803 So.2d 598, 610 (Fla.2001)). “In such cases, proof of the intent to avoid arrest or detection must be very strong.” Id. (citing Riley v. State, 366 So.2d 19, 22 (Fla.1978)).
In some cases, this Court has upheld the avoid arrest aggravator where a defendant made statements indicating his fear of arrest or his desire to eliminate a witness. Id. (citing Bevel v. State, 983 So.2d 505, 519 (Fla.2008)); Trease v. State, 768 So.2d 1050, 1056 (Fla.2000) (upholding aggravator where defendant said he killed the victim because the victim could identify him); Walls v. State, 641 So.2d 381, 390 (Fla.1994) (upholding aggravator where defendant confessed he killed the victim because he wanted no witnesses). “[I]n other cases this Court *303 has approved the finding based on circumstantial evidence, without any direct statements by the defendant indicating a motive to eliminate witnesses.” Hernandez, 4 So.3d at 667 (citing Swafford v. State, 533 So.2d 270, 276 (Fla.1988)). “[E]ven without direct evidence of the offender’s thought processes, the arrest avoidance aggravator can be supported by circumstantial evidence through inference from the facts shown.” Id. (quoting Swafford, 533 So.2d at 276 n. 6). Circumstantial evidence generally relied upon to prove this aggravator includes “whether the victim knew and could identify' the killer and ‘whether the defendant used gloves, wore a mask, or made incriminating statements about witness elimination; whether the victims offered resistance; and whether the victims were confined or were in a position to pose a threat to the defendant.’ ” Id. (quoting Farina v. State, 801 So.2d 44, 54 (Fla.2001)).
Here, the avoid arrest aggravator is supported by both direct and circumstantial evidence. The direct evidence arises from the recorded statements Phillips made to police detectives and to Katrina Joyce. In particular, Phillips told Ms. Joyce, “If I don’t shoot him, the possibility that me and the other dude got shot up, or guaranteed to go to prison the rest of our life.” Phillips later told police detectives that Mr. Aligada put him in a situation where Phillips “wanted to come out on top” and that he would not “come out if I let him prevent me from getting away. I’m on foot so I couldn’t let him stop me.” Further, he explained that, even though there were a few other people in the parking lot, they could not get a good look at him because he was standing in the shadows. But the guy who knew him (Mr. Aligada) saw him and started yelling, which alerted Mr. Sweet of his presence. At that point, Phillips said he pulled out his firearm and, when Mr. Aligada continued to approach, he shot him.
In addition' to Phillips’s direct statements, the circumstances surrounding the shooting also support the finding that the murder was committed to avoid arrest. First, it is evident that Phillips and Mr. Aligada knew each other because Phillips told the detective that he had spoken to Mr. Aligada about getting a job at Builder’s First. Second, through Phillips’s statements, it is evident that the two recognized each other the night of the murder. In particular, Phillips knew that Mr. Aligada recognized him because he stated that as soon as he came around Mr. Sweet’s truck, “the guy who knew him,” Mr. Aligada, started yelling, “Hey so and so and so and so.” And Phillips recognized Mr. Aligada because he admitted he saw him in his truck before he ever began to approach. Third, instead of fleeing the scene after he completed the robbery, Phillips fatally shot Mr. Aligada, and he also shot at Mr. Sweet while Mr. Sweet was running for safety. Notably, Phillips was not wearing anything to mask his identity. And Phillips was not engaged in a struggle with the victim when he fired. Therefore, there is competent substantial evidence to support the trial court’s finding that Phillips’s dominant motive for shooting Mr. Aligada was to eliminate a witness to the armed robbery. Accordingly, the trial court did not err in instructing the jury on the avoid arrest aggravator or in finding the aggravator and affording it great weight.

B. The Jury Instruction

Phillips next argues that the trial court erred by improperly instructing the jury during the penalty phase. Due to this perceived erroneous instruction, Phillips also claims that the trial court erred in *304 giving the jury recommendation great weight. We disagree.
Prior to the penalty phase, the trial court held a hearing wherein the prosecution raised the issue of the penalty phase jury instructions. The prosecution requested the standard jury instructions but noted that in the past, at the request of the defense, additional language, “something to the effect of, I am required to assign and give great weight to your recommendation and cannot override it unless reasonable men and women would not differ and need to depart,” had been added. Defense counsel replied, ‘Tes, Your Hon- or, that is true. We do request that. In fact, in every case I have tried that additional proviso has been added by the court, to the point I had thought it was a standard jury instruction at this point in time.”
Thereafter, the trial court agreed to read the standard instructions and to include the additional language requested by the defense. In relevant part, the penalty phase instruction actually given was as follows:
The punishment for this crime is either death or life in prison without the possibility of parole. The final decision as to what punishment shall be imposed rests solely with the judge of this court. However, the law requires that you, the jury, render to the Court an advisory sentence as to what punishment should be imposed upon the defendant. I am required to assign and give great weight to your recommendation and cannot override it unless reasonable men and women would not differ on the need to depart from the advisory sentence.
“This Court has repeatedly rejected claims that the standard jury instructions impermissibly shift the burden to the defense to prove that death is not the appropriate sentence or that these instructions unconstitutionally denigrate the role of the jury in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)].” Chavez v. State, 12 So.3d 199, 214 (Fla.2009) (citing Taylor v. State, 937 So.2d 590, 599 (Fla.2006)) (citing Elledge v. State, 911 So.2d 57, 79 (Fla.2005); Mansfield v. State, 911 So.2d 1160, 1180 (Fla.2005); Sweet v. Moore, 822 So.2d 1269, 1274 (Fla.2002)). As this Court has stated, “[T]he standard jury instructions fully advise the jury of the importance of its role, correctly state the law, and do not denigrate the role of the jury.” Reese v. State, 14 So.3d 913, 920 (Fla.2009) (quoting Barnhill v. State, 971 So.2d 106, 117 (Fla.2007)).
This Court has also approved of instructions that include the weight the trial court must give to the jury’s recommendation. See Smith v. State, 998 So.2d 516, 529-30 (Fla.2008).
Similarly here, the trial court gave the standard penalty phase jury instructions, adding one additional sentence at the request of the defense regarding the great weight the trial judge may assign to the jury’s recommendation. Defense counsel not only requested this additional language, he also stated that he believed it was part of the standard instruction. Therefore, even if this Court found the additional statement improper, any error acted to the benefit of the defense. Moreover, the defense cannot now reasonably complain of an instruction it requested or any error it invited. See Downs v. State, 977 So.2d 572, 574 (Fla.2007) (“[U]nder Florida law, ‘[a] party may not invite error and then be heard to complain of that error on appeal.’ ”) (quoting Cox v. State, 819 So.2d 705, 715 (Fla.2002)) (quoting Pope v. State, 441 So.2d 1073, 1076 (Fla.1983)). Accordingly, we hold that the instruction was not in error.
*305 We further hold that the trial court did not err in assigning great weight to the jury’s recommendation. Giving great weight to the jury’s recommendation does not mean that the trial judge is bound by the jury’s recommendation. See Ross v. State, 386 So.2d 1191, 1197 (Fla.1980). Rather, regardless of the jury’s recommendation, the trial judge must conduct an independent analysis of the aggravating and mitigating circumstances. § 921.141(3), Fla. Stat. (2007); Ross, 386 So.2d at 1197. “The relative weight given to each mitigating factor is within the discretion of the sentencing court.” Trease v. State, 768 So.2d 1050, 1055 (Fla.2000). And the trial judge should utilize his experience to balance the facts of the case against the facts in other criminal cases independent of the jury’s recommendation. Ross, 386 So.2d at 1197.
Here, the trial judge balanced the facts of the case and did not merely rely on the jury’s recommendation. A review of the trial court’s sentencing order reveals that the trial court reviewed all the evidence presented during both the guilt and sentencing phases, the Spencer hearing, and in the sentencing memoranda submitted by the parties. It then gave individual consideration to each aggravating and mitigating circumstance and explained how the evidence proved each of the three aggravating factors beyond a reasonable doubt. The trial court also considered each of the nonstatutory mitigating circumstances and assigned each an appropriate weight. Additionally, the trial court stated that it understood “that this is not an arithmetic comparison, but one which requires qualitative analysis.” Then, it concluded that “the ultimate penalty which this Court can impose in this case, should be imposed.” In conclusion, it noted that any of the aggravating circumstances considered in this case, “standing alone, would be sufficient to outweigh the mitigation in total presented regarding the murder of Christopher Aligada.”
Accordingly, the trial judge adequately and independently considered the evidence as well as the aggravating and mitigating circumstances before it -imposed the death penalty. Therefore, the trial court did not err in giving “great weight” to the jury’s recommendation óf death.

C. Proportionality

Phillips next argues that the death sentence is disproportionate here. We disagree.
In death penalty cases, this Court performs a proportionality analysis in order to prevent the imposition of unusual punishments under the Florida Constitution. See Tillman v. State, 591 So.2d 167, 169. (Fla.1991). In deciding whether death is a proportionate penalty, this Court considers “the totality of the circumstances in a case” and compares the case with other capital cases. Urbin v. State, 714 So.2d 411, 417 (Fla.1998) (quoting Sliney v. State, 699 So.2d 662, 672 (Fla.1997)). “Proportionality review is not simply a comparison between the number of aggravating and mitigating circumstances.” Blake v. State,. 972 So.2d 839, 846 (Fla.2007) (quoting Connor v. State, 803 So.2d 598, 612 (Fla.2001)). And “[t]his Court’s function is not to reweigh the mitigating factors against the aggravating factors; that is the function of the trial judge.” Id. (quoting Connor, 803 So.2d at 612).
Here, the trial court independently addressed each aggravating and mitigating circumstance. After considering the aggravating circumstances — (1) Phillips was convicted of another capital felony or of a felony involving the use or threat of violence, to the person, (2) the crime for which Phillips was to be sentenced was committed while the defendant was engaged in *306 the commission of the crime of armed robbery, and (3) the crime for which Phillips was to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest, or effecting escape from custody— the trial court assigned each great weight. There were no statutory mitigating circumstances found, but the trial court also considered twenty-five nonstatutory mitigating circumstances and assigned each a relevant weight. Then, after comparing the circumstances in the instant case to other capital cases, the trial court followed the jury’s recommendation and sentenced Phillips to death.
In cases such as the instant case, where the aggravating circumstances are very strong and the mitigating circumstances are relatively weak, this Court has found that- the death penalty is proportionate. See, e.g., Lebron v. State, 982 So.2d 649 (Fla.2008) (death sentence proportionate with the prior violent felony, felony while engaged in a robbery merged with murder committed for financial. gain aggravating circumstances, weak mitigation, and a jury recommendation of death by a vote of seven to five); Bailey v. State, 998 So.2d 545 (Fla.2008) (death sentence proportionate when murder was committed by a person on probation and the murder was committed to avoid arrest and there were eight nonstatutory mitigating circumstances); Taylor v. State, 937 So.2d 590 (Fla.2006) (death sentence proportionate with three aggravators — Taylor was on felony probation, he had a prior violent felony, and the murder was committed for pecuniary gain — and thirteen nonstatutory mitigating circumstances); Shellito v. State, 701 So.2d 837 (Fla.1997) (death sentence proportionate with the. prior violent felony and commission during a robbery merged with pecuniary gain aggravators and several nonstatutory mitigating circumstances including substance abuse, family issues, mental issues, and a troubled childhood); Reaves v. State, 639 So.2d 1 (Fla.1994) (death sentence proportionate with the prior violent felony and avoid arrest aggravators and relatively weak mitigation).
Accordingly, we conclude that the death penalty is proportionate here.

D. Jurors Observing Phillips in Jail Uniform

Phillips next argues that he should be awarded a new trial because three of the jurors observed him in his jail uniform. We disagree.
Prior to the beginning of trial, and after the jury was chosen but not sworn, the trial court held a hearing to consider Phillips’s concern that some of the jurors saw him coming down the hallway to the courtroom wearing handcuffs, shackles, and his jail uniform. No evidence presented at the hearing confirmed that any of the jurors actually saw Phillips, but the trial court agreed to question the jury about the matter. Thereafter, when the trial judge asked the jury panel whether any of them noticed Phillips anywhere in the courthouse before entering the courtroom, three jurors raised their hands. Those three jurors were then separately questioned about the circumstances.
The first juror stated that he saw Phillips in the hall in his “clothing” before he changed into his suit. But he did not hear any conversation.[9] The trial judge then asked the first juror whether he could set aside anything he observed and not use it in making a determination in reaching a *307 verdict. And the first juror answered that he could.
The second juror stated that the observation was insignificant because Phillips did not talk, and all she noticed was that he had on different clothes from the day before. The court asked the second juror whether she could set aside anything she may have seen and base her verdict “solely on the evidence that’s presented, the arguments of the attorneys and the instructions of the law by the court.” • And the second juror said that she could. Afterwards, the second juror was further questioned by the defense:
Defense Counsel: When you saw him, what clothing was he dressed in? Can you describe it?
Second Juror: He had on the green uniform.
Defense Counsel: And what did that mean to you?
Second Juror: Well, I did think, you know, when I saw him yesterday, I remembered he had on a suit, so I was thinking I didn’t know they came over, you know, dressed in that. I thought they came over dressed in a suit.
Defense Counsel: When you say came over—
Second Juror: Well, I thought when he — when they came from the — I thought he’s at the jail, right?
The Court: Well I can’t answer that question, but if that’s what you thought, that’s okay.
Second Juror: Well, that’s what I thought he was. I thought he was at the jail and I thought when they brought him over, he would be coming over in a suit, I didn’t know they brought him over in his uniform.
Defense Counsel: Thank you.
The second juror was excused, and the third juror was brought in and questioned about his seeing Phillips in the hall. The third juror said that he saw Phillips in the hall with a uniformed bailiff but that he (the third juror) immediately stepped into the juror restroom. Then, defense counsel asked:
Defense Counsel: May I ask you what clothing he was dressed in?
Third Juror: It was green.
Defense Counsel: And what did that mean to you?
Third Juror: That he was a prisoner.
Defense Counsel: Thank you.
The court then asked the third juror if he could set aside what he saw and base his verdict solely on the evidence and the law. And the third juror answered that he could.
After the third juror was excused, defense counsel moved to strike the entire panel based upon the fact that the jurors knew Phillips was a prisoner, they knew he was incarcerated, and they may have believed that he was incarcerated for some other crime. The trial court denied the motion, finding that the inadvertent sighting of Phillips in his jail clothing was not so prejudicial that it required that the jury panel be stricken or that a mistrial be entered.
This Court has “long held that a juror’s or prospective juror’s brief, inadvertent view of a defendant in shackles is not so prejudicial as to warrant a mistrial.” Hernandez, 4 So.3d at 658 (citing Singleton v. State, 783 So.2d 970, 976 (Fla.2001)); see also Cooper v. State, 739 So.2d 82, 85 n. 8 (Fla.1999) (“[T]he fact that jurors may have inadvertently seen [the defendant] in shackles when he was being transported to or from the courtroom does not require reversal.”). In Heiney v. State, 447 So.2d 210, 214 (Fla.1984), Heiney argued that the *308 trial court erred in denying his motion for a mistrial “based on his allegation that some of the jurors may have momentarily seen him in chains on two occasions while he was being transported to and from the courtroom.” The trial court denied the motion stating that “if any of the jurors even saw Heiney, it was only for a fleeting moment in the corridor.” Id. On appeal, this Court concluded that the sighting was “was not so prejudicial as to require a mistrial.” Id. This Court explained that, while it is not permissible to force a defendant to stand trial in prison garb or handcuffs over his objection, the inadvertent sight of a defendant in handcuffs or prison clothes by the jurors is not so prejudicial that it requires a mistrial. Id.
Likewise here, the fact that three jurors briefly viewed Phillips in his jail uniform does not warrant awarding Phillips a new trial. The facts here show that only three jurors glimpsed Phillips as he was being transported to the courtroom in his jail uniform. Phillips was not forced to stand trial in a jail uniform or handcuffs. Rather, three jurors only glimpsed Phillips outside the courtroom as he passed the hallway where the jurors gathered before trial. Furthermore, all three jurors who noticed Phillips were interviewed regarding the incident and all stated that they could set aside what they saw and base their verdict solely on the evidence presented.
Accordingly, we hold that the trial court did not err either in denying Phillips’s motion to strike the entire jury panel or in denying Phillips’s motion for a new trial.

E. Sufficiency

In death penalty cases, this Court conducts an independent review of the sufficiency of the evidence. See Insko v. State, 969 So.2d 992, 1002 (Fla.2007). Regardless of whether the appellant raises this issue, the Court must “determine whether sufficient evidence exists to support a first-degree murder conviction.” Snelgrove v. State, 921 So.2d 560, 570 (Fla.2005) (citing Mansfield v. State, 758 So.2d 636, 649 (Fla.2000)). Whether the evidence is sufficient is judged by whether it is competent and substantial. See Blake v. State, 972 So.2d 839, 850 (Fla.2007).
Here, there was competent and substantial evidence sufficient to support Phillips’s conviction. First, Phillips was positively identified from a photo lineup by two separate witnesses. In addition, several other witnesses gave a description of the man they saw shoot Mr. Aligada and drive off in Mr. Sweet’s truck, and those descriptions were consistent with Phillips’s identity. Second, the DNA found on the gear shift of Mr. Sweet’s truck was consistent with Phillips’s DNA; and a DNA expert testified that the possibility of finding another match for this particular DNA is extremely small, namely about one in 2 trillion Caucasians, one in 9.5 trillion African-Americans, and one in 6.1 trillion Southeastern Hispanics. Third, Ms. Joyce testified that Phillips told her that he robbed someone and shot another person who tried to be a hero and that the incident happened in a parking lot. This admission was also captured on tape and played for the jury, as Ms. Joyce agreed to question Phillips about the incident and allow the police to record the conversation. Fourth, Phillips himself confessed to police detectives, and a videotape of him relating the details of the crime was played for the jury during trial. On the tape, Phillips stated that Mr. Aligada forced him because Mr. Aligada was trying to grab his gun. He admitted that he had been waiting by the truck and that he pointed his gun at Mr. Sweet. He also admitted that he shot Mr. Aligada because he was approaching him and trying to be a hero. *309 Finally, Phillips fled after the crime, and he told the detectives that he dismantled the gun he used in the crime and “spread it all over a state.” None of this evidence was refuted by the defense. Accordingly, we hold sufficient evidence exists to support a first-degree murder conviction.
CONCLUSION
For the foregoing reasons, we affirm Phillips’s conviction and sentence of death.
It is so ordered.
QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.

. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

. At the time, Mr. Long did not know that the man who approached him was Phillips; but later, Mr. Long positively identified Phillips from a group of photographs.

. Mr. King, another employee of Builder’s First, testified that he was going to sell his wife's Ford Mustang to Mr. Sweet and that on the day of the murder Mr. Sweet called him and told him he had the money with him to pay for the car. But Mr. King was out of town, so the transaction was not completed.

. Phillips is African-American.

. Phillips stated that he met with Mr. Aligada a couple of weeks before the murder because Mr. Aligada was going to help him get a job a Builder’s First. But Phillips said he never completed the application.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. Phillips was convicted of shooting his aunt in the legs with a sawed-off shotgun when he was seventeen years old, and he served five years in prison for the crime. Additionally, after Phillips killed Mr. Aligada, but before he was arrested for the crime, Phillips committed another armed robbery wherein he discharged his gun thirteen times at someone who was attempting to thwart the crime. No one was hurt..

. Phillips also claims that Florida’s capital sentencing procedures are unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We need not address that issue, however, because the prior violent felony aggravator applies in this case. Consequently, Ring does not apply. See Bryant v. State, 901 So.2d 810, 823 (Fla.2005); Patton v. State, 878 So.2d 368, 377 (Fla.2004).

. There was purportedly also a heated exchange between Phillips and the bailiff after the two passed the area of the hall where Phillips claimed the jurors may have spotted him in his jail uniform. However, the hearing revealed that none of the jurors heard or witnessed that exchange.