# Supreme Court of Florida

_____

No. SC12-579
_____

**HUMBERTO DELGADO, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[April 23, 2015]

PER CURIAM.

Humberto Delgado, Jr., appeals his sentence of death for the murder of Corporal Michael Roberts of the Tampa Police Department. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we vacate the sentence of death and remand to the trial court for imposition of a life sentence.

## I. FACTS AND PROCEDURAL HISTORY

In November 2011, Humberto Delgado, Jr. (Delgado) was convicted of carrying a concealed firearm, depriving a law enforcement officer of his means of communication, and first-degree felony murder in the shooting death of Corporal Roberts in Hillsborough County. Delgado was also found guilty of aggravated

assault on a law enforcement officer, Sergeant Paul Mumford, in connection with the same events that resulted in the death of Corporal Roberts. The evidence presented at Delgado's trial established the following facts.

On August 19, 2009, Delgado took a bus to a jewelry store to retrieve some money he had previously used to place a watch on layaway. Upon arriving at the store, he was told that there was not yet enough money in the cash drawer for him to receive his refund and he would have to wait for someone with cash to make a transaction at the store. Delgado waited about forty-five minutes, but when the store still could not process his refund, he left, taking a bus back to the storage facility where he had slept the night before. He transferred some of his belongings, including his laptop computer and four firearms, from the storage unit into a backpack. Then, despite suffering from chronic knee pain, Delgado decided to walk, with his cane, from Oldsmar, Florida, to a veterans' hospital in Tampa to seek assistance and shelter.

Approximately eight hours later, Corporal Roberts observed Delgado pushing a shopping cart along the roadway in an area known for shopping cart theft and other crimes committed by homeless individuals. It was a hot, rainy day, and Delgado had walked approximately fifteen miles at that point. At 9:58 p.m., Roberts radioed a Tampa police dispatcher that he was about to conduct a routine field investigation. Roberts then pulled his police cruiser onto the side of the road

and stopped Delgado for questioning. According to Delgado's description of the events as told to the various mental health experts testifying at trial, Roberts asked Delgado for identification, at which point Delgado presented his Florida driver's license and his veteran identification card. Roberts then began to search the shopping cart and the backpack Delgado was transporting in the cart. Delgado became concerned that Roberts would discover the laptop and the firearms, so he began to flee, at which point Roberts tasered him. A fistfight then broke out between the two men, ending when Delgado shot Roberts. Delgado then called his uncle, stating that after a scuffle with an officer, Delgado had shot the officer, the officer was on the ground, and Delgado thought the officer might be dead. Delgado's stepmother, who had heard the conversation via speakerphone, testified that Delgado stated, "Uncle, forgive me. Uncle, forgive me. I think I killed a police officer. Uncle, forgive me. I think that I am going to kill myself."

At some point during the scuffle, the police dispatcher received a brief transmission from Roberts' handheld radio, indicating to her that Roberts might be in distress. She immediately requested that another officer respond to Roberts' location. Within minutes, Sergeant Mumford arrived on the scene. He saw Delgado holding a backpack, jogging slowly toward Roberts' police car. When Mumford scanned Delgado's path of travel, he noticed Roberts' motionless body

on the ground.  He thought Delgado was a homeless person coming to assist Roberts, until Delgado passed Roberts' body and kept running.

At that point, Mumford realized Delgado was a possible suspect and began running after Delgado, telling him to stop.  While running, Delgado began digging in his backpack, until it fell to the ground.  He reached inside of it and retrieved a firearm.  Mumford then witnessed Delgado position himself in a "two-point stand," which officers are trained to do, with the gun pointed directly at Mumford. Mumford sought cover behind a building, but Delgado did not shoot.  When Mumford peered back around the corner of the building, he saw Delgado running towards a park with the weapon still in his hand.  Realizing that he was no longer in immediate danger, Mumford went back to the original crime scene to cover Roberts and wait for back-up.

At trial, an eighteen-year-old boy walking in the park that night with his brother testified that a man he later identified as Delgado was running through the park, crying, holding a gun down by his side.  Delgado asked the boys for help and stated that the police were trying to kill him, but the two boys ran away.  Several minutes later, a K-9 unit apprehended Delgado, who was hiding in a wood pile in the yard of a nearby home.

After Delgado was taken into custody, officers retrieved—either from his person, his effects, or the vicinity—four firearms:  one Kel-Tec high-capacity

assault rifle with a thirty-round magazine; one RG Industries .22 caliber, six-shot revolver; one Taurus .45 caliber, semiautomatic pistol; and one Glock 9mm semiautomatic pistol. Additionally, officers retrieved a cell phone, lead TASER wires, and a green wallet found on the ground near Delgado's shopping cart. The wallet contained receipts for four firearms that had been purchased between November 2006 and April 2008, a community college ID card in the name of Humberto Delgado, and a folded note which read:

> A message of promise to this evil world, filled with liars and cheaters and monkey cheetahs. I am who I am. A living man who was betrayed and who knows that he is always being betrayed for bullshit. But since I do not like bullshit the Living GOD and eye have designed a punishment that is so great 4 U MONKEY CHEETAHS. That you will understand who is, who is, A LIVING GOD. DON'T worry for me anymore because of your zips and socials your SOULS, soulS, souls, souls are lost to be MINED. So as (I am) priceless and free so will all mines be. All who stand against this Ay Ay will understand what it means to dye.
> In loving memory I meditate you. As Pacheco as can be, as Humberto Delgado Jr. and all his children can be, as Tito can be, as those I love can be, as Abel can be, as the third Adam can be, as Wahman can be, as this whole world can be. Love you GOD for ever and ever, Amen.
>
> 777
> 8

A walking cane was found leaning against the shopping cart that Delgado had been using. At the scene where Delgado was apprehended, officers found Roberts' handheld police radio.

### A. Background

At the guilt phase, the defense presented testimony regarding Delgado's background and the events leading up to the shooting. Delgado grew up in the Virgin Islands and, after high school, obtained his first job as a police officer with the United States Virgin Islands Police Department. During Delgado's five-year tenure there, he was approached about joining the Masons, but declined the invitation. This occurrence created not only a distrust for the police force, but also a cycle of extreme paranoia and abnormal behavior that made Delgado's mental health issues more apparent to his family and friends. Delgado began to believe that people were following him or sitting in trees outside his home watching him and his family. Because of this fear, he did not want his children to attend school. He would force them to sleep on the floor or lie down while riding in vehicles in case people were looking through the windows. Delgado would also tell family members that there were demons outside who wanted his sons' "special blood" or that his children's legs were goat legs and he had to cut them off because the legs were "evil."

In 2003, Delgado's wife had him involuntarily committed for mental health treatment for about a week. He began taking medication that seemed to help him, but soon stopped taking it because it made him feel "like a zombie." The paranoid delusions began again, causing Delgado to have trouble sleeping and eating, and he would sometimes just pace back and forth. Delgado and his wife soon divorced.

When Delgado left the police force, he went to work for an oil refinery located on another island. However, his delusions about the police and the Masons conspiring to kill him continued. Delgado began walking the streets at night, saying that demons, the Masons, or the rapper 50 Cent were after him and trying to kill him. Delgado would take his clothes off at home or in public, claiming that God told him not to wear clothes or not to shower. On one occasion, Delgado was spotted walking on the highway without a shirt or shoes. Eventually, Delgado was hospitalized for a second time in 2003 for about two weeks.

In addition, Delgado began wearing gloves, walking with a cane, and claiming to be a character from the Bible. He would also set up mirrors in his home in order to catch demons at night and write "777" on the doors of his apartment or on the back of pictures. Delgado stopped going to his father's house because he was afraid that his father and stepmother were trying to poison him. The two eventually got an apartment for Delgado close to where they lived to make sure that he was eating, bathing, and caring for himself, but he only lived there for about a year before joining the military.

Delgado's delusions continued during his military service. He asserted that 50 Cent and his entourage, as well as some of Delgado's former coworkers, were trying to kill him. One time Delgado stayed awake for four days because of this concern, eventually choosing to stay with a friend in the barracks. One night at

2:00 a.m., Delgado called his stepmother to tell her that 50 Cent had put out a hit on him and he needed to take the batteries out of the phone because people could hear what he was saying. Delgado claimed to see angels and people who had passed away. At one point, he became very depressed, stopped eating solid foods, and drank only liquids, but he also fasted and prayed often. Delgado also stated that he had seen a vision from God in which God told him that someone was about to kill him and stated that someone in his unit, who looked like 50 Cent's brother, was trying to kill him because 50 Cent wanted him dead. Delgado's behavior caused him to be admitted to inpatient services at the Womack Army Medical Center in Fort Bragg in 2005.

Upon admission, Delgado tested negative for any type of drug or alcohol intoxication.[1] He was diagnosed with Bipolar I Disorder with "psychotic features." At trial, Dr. William Leusink, a psychiatrist at the Medical Center, testified that at the time of hospitalization, Delgado was suffering from a manic episode, characterized by a severely elevated mood, sleep deprivation, hyper-religious thinking, pressured speech (a loud, rapid speech pattern), and delusions. Dr. Leusink explained that an individual suffering from a delusion cannot be talked out of a belief, regardless of how much information is given to him or her, because that delusion is reality, whereas a person suffering from an irrational belief can be

---

1. As found by the trial court, Delgado did not abuse drugs or alcohol.

persuaded that the belief is irrational. While hospitalized, Delgado voluntarily agreed to take his prescribed medications. Although at this time Delgado no longer felt that he was being followed, he still did not gain the insight to realize that his beliefs were not reality. Dr. Leusink recommended that Delgado be discharged from the military, based on the reasoning that "there was nothing that [could be done] to cure" Delgado's mental illness and that "he would probably have the condition his entire life."

In June of 2009, Delgado moved in with his uncle in Oldsmar, Florida, until approximately two weeks before the shooting, but his abnormal behaviors continued. Day and night, he would pace throughout the house, in and out of different rooms, talking to himself. He was not sleeping and complained of constant headaches. He also maintained that people were trying to kill him and that he was not getting enough help from the Department of Veterans Affairs (the V.A.). Delgado's odd behavior frightened his uncle's three daughters, and Delgado was asked to leave at the end of the month. Delgado instead left immediately.

After leaving his uncle's home, Delgado stayed with friends during the two weeks leading up to the murder. During that time, Delgado complained that someone was out to get him and on one occasion, barricaded the door with his belongings to prevent anyone from entering while Delgado was home alone.

Delgado often paced back and forth, did not sleep well, and complained that the Masons were after him. He also called himself Abel after a character from the Bible. Despite his behavior, whenever his friend mentioned Delgado's mental health or suggested that he seek treatment, he would become defensive or resentful, failing to acknowledge that he had any mental health problems.

After lodging with friends, Delgado began to seek shelter through the V.A. He visited the Bay Pines V.A. Medical Center twice. About seven days before the shooting, he was examined by a psychiatrist there who described him as goal-directed and clear in his communications, not exhibiting any type of manic or psychotic behaviors. Two days later, during an interview to assist Delgado in finding housing, a social worker did not observe any symptoms of psychosis from Delgado and administered a questionnaire to him on which he did not indicate any psychosis or depression. However, after the interview, the social worker offered Delgado the option of being placed into a facility for the severely and persistently mentally ill. Delgado eventually found housing at the V.A. However, after staying there for a couple of days, Delgado chose not to stay because he thought the people there were "crazy."

A few days before the shooting, Delgado called his ex-girlfriend in a panic, telling her that someone was calling his phone and hanging up and that he was convinced that someone was trying to kill him. He asked to stay with her in North

Carolina until he could get enough money to fly back to St. John to live with his mother. When his ex-girlfriend told him she would have to call him back, he became upset. Later, she tried calling him back twice: the first time, no one answered, and the second time, the phone appeared to be disconnected.

On the day of the shooting, Delgado called his uncle to ask him about a V.A. location in Tampa. That day, it had been raining very hard, and Delgado wanted shelter. Delgado's uncle offered to give him a ride to the location, but Delgado refused. That was the last time Delgado's uncle heard from Delgado before the shooting. Later that evening, Delgado called again, this time asking for his uncle's forgiveness and telling his uncle that he had shot a police officer, who was possibly dead, and that Delgado was going to kill himself. Delgado's uncle told him not to do that and to think about his family. The call ended immediately thereafter.

## B. Expert Testimony

A total of six expert witnesses testified at various stages of trial. Dr. Michael Maher, a board certified psychiatrist with a specialty in forensic psychiatry, testified for the defense at the guilt phase and Spencer[2] hearing. He interviewed Delgado a total of eight times; the first time occurred two weeks after the murder. Dr. Wade Myers testified for the State at the guilt phase and Spencer hearing. He is a professor of psychiatry and board certified psychiatrist in general

---

2. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

- 11 -

psychiatry, child adolescent psychiatry, and forensic psychiatry. Dr. Myers evaluated Delgado in person approximately two years after the murder. Dr. Barbara Stein also examined Delgado approximately two years after the murder. Dr. Stein's specialty is in psychiatry and forensic psychiatry. She testified for the State at the guilt phase and for the defense at both the penalty phase and Spencer hearing. As with Dr. Stein, Dr. Donald Taylor testified for the State at the guilt phase and for the defense at the penalty phase and Spencer hearing. Dr. Taylor is a board certified forensic psychiatrist. He interviewed Delgado in person approximately two years after the murder.

Two additional experts were introduced at the penalty phase hearing. Dr. Harry Krop, a clinical psychologist with a specialty in neuropsychology, testified for the defense at both the penalty phase and Spencer hearing. He interviewed Delgado three times, beginning a little over a year after the murder. Lastly, Dr. Mark Ruiz also testified for the defense at the penalty phase and Spencer hearing. Dr. Ruiz is a clinical psychologist specializing in general clinical psychology, general practice, and forensic evaluations. He evaluated Delgado two days after the shooting, as well as on at least four additional occasions.

All six experts diagnosed Delgado with some form of bipolar disorder. Five specified a diagnosis of bipolar disorder with psychotic features. Dr. Taylor described this disorder as alternating between manic and depressive episodes, with

manic episodes being characterized by elevated or irritable mood, rapid speech, lack of sleep, and delusional beliefs such as grandiose or persecutory delusions, and depressive episodes manifested as low mood, loss of energy, loss of appetite, and loss of pleasure in life. Dr. Stein, who also diagnosed Delgado with bipolar-type schizoaffective disorder, described that disease as a slightly more serious condition, closer to schizophrenia than bipolar disorder and characterized by hallucinations and false sensory perception; mood problems such as depression, mania, or severe agitation; and problems organizing one's thinking, specifically in the areas of impulse control and judgment. Four experts identified additional diagnoses, which included acute stress disorder, adjustment disorder, paranoid personality disorder, delusional disorder, and a major depressive disorder.

Dr. Ruiz estimated a Global Assessment of Functioning score for Delgado of around the mid-forties, indicating that Delgado had very severe symptoms that were affecting his social and occupational functioning. Ruiz explained that a score of one hundred indicates superior functioning and zero equals the worst functioning possible. Delgado's score indicated very severe mental illness sufficient for admission into the psychiatric unit of a hospital. Further, Dr. Ruiz administered a malingering test and found no evidence that Delgado was over-representing, exaggerating, or feigning his symptoms. Dr. Krop's testing also revealed no evidence of malingering. Dr. Stein testified at the Spencer hearing that

- 13 -

although Delgado had been in jail and medicated for some time before she met with him, Delgado still maintained his delusional belief system that people like the Masons and police officers were after him—this aspect was just not as threatening to him at the time of her interview with him. She opined that the delusional thinking would always be present, but that Delgado's medication at that time controlled the intensity of his feelings and his reaction to them. Three experts testified that Delgado's illness could be properly managed in a structured, controlled environment.

Five of six experts testified that both statutory mental health mitigators applied in this case. As to whether Delgado was operating under the influence of an extreme mental or emotional disturbance, the experts cited various psychosocial stressors Delgado was experiencing at the time: an inability to find permanent residence, at times to the point of homelessness; his perception of inadequate assistance from the V.A. system; sleep deprivation; distress about his finances; poor eating habits; watching various relationships and friendships fall apart because of his mental illness; chronic pain and physical problems, likely exacerbated by his fifteen-mile walk; feelings of isolation and rejection from his family and ex-girlfriend; frustration at his inability to work; and feeling he had no option but to walk to Tampa to seek shelter and medical care. Several experts opined that Delgado's mental illness and paranoid delusions combined with these

life stressors to create a heightened, and even hypomanic, emotional state and level of anxiety, making him even more paranoid and depressed. Dr. Taylor explained that for someone who has a disturbed mood such as bipolar disorder, mood swings in response to an event can happen more quickly and more severely than for a person who does not have such a disorder.

Conversely, Dr. Myers testified that although Delgado exhibited some signs of agitation and suspicion that day, he did not have the associated symptoms of mania or severe depression needed to meet the criteria for a bipolar disorder episode. Dr. Myers did acknowledge, however, that Delgado was experiencing symptoms of hypomania at the time of the crime, which Dr. Myers described as including decreased sleep, increased energy, increased goal-oriented activity, and agitation or trouble sitting still. While recognizing Delgado's extensive mental health history, Dr. Myers found that Delgado did not have symptoms of such extreme disturbance in the time period surrounding the crime, but instead exhibited only some mild symptoms of mental illness.

Five experts also found that Delgado's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired. Several experts pointed to the psychosocial stressors that exacerbated Delgado's mental illness, worsening his mental state to the point of hypomania, which is characterized by irritable mood, impulsivity, sleeping poorly, and making

poor decisions. Dr. Taylor found that Delgado's impulsivity would also have been intensified by this hypomania, thereby shortening Delgado's fuse, making him react more quickly to stressful situations and making it difficult for him to refrain from doing something wrong. Dr. Stein also opined that impulsivity played a role in the shooting and noted that Delgado not having engaged in threatening or violent behavior before, despite his long-standing history of mental illness, further highlighted the exacerbating effect of the social stressors. In addition, Dr. Taylor noted that Delgado's prior interactions with law enforcement—for example, when he was homeless and approached by an officer for sleeping in a public park—did not result in any kind of violent or aggressive behavior.

Two experts also identified Delgado's delusional history as part of the problem, causing him to have a general mistrust or suspicion of police officers. Dr. Krop testified that Delgado's perception that he had done nothing wrong led him to suspect corruption from Corporal Roberts, which further reinforced his delusional beliefs. Being tasered simply confirmed Delgado's fear that he would either be harmed by this officer or placed in jail where some other attack would occur. Dr. Krop testified that Delgado's anxiety level was so high that his ability to appreciate the criminality of his action was substantially impaired.

On the other hand, Dr. Myers did not find substantial impairment. He determined that the murder was not a product of impulsivity because Delgado had

not been acting impulsively that day—being able to wait for thirty to forty-five minutes at the jewelry store for his refund. Dr. Myers did acknowledge, however, that as a result of the hypomania Delgado experienced at the time of the crime, Delgado was feeling things more intensely and operating on a shorter fuse than usual, making him move more quickly from frustration or anger to a point of acting on those feelings in a more serious way.

Dr. Maher testified that both mitigators applied. He explained that the additional stresses Delgado was experiencing made him more vulnerable to responding to the interaction with Corporal Roberts by reverting to his paranoid, delusional belief system that police officers are tied in with evil forces and want to kill him. In Dr. Maher's opinion, Delgado's state of mind at the time of the offense was that someone was going to kill him and that he had better fight back and run.

### C. Procedural History

At the penalty phase, the State presented victim impact statements from Jane Castor, the Chief of Police for the City of Tampa; Charlene Penrose, the victim's sister-in-law; and Cynthia Roberts, the victim's wife. The defense presented five lay witnesses, including Dr. Jose Hernandez, who was Delgado's treating psychiatrist at the Hillsborough County Jail when Delgado was first arrested. After the initial evaluation of Delgado, Dr. Hernandez found that Delgado was very

- 17 -

delusional and paranoid and started Delgado on antipsychotic and antidepressant medications. This treatment plan continued during the subsequent year and a half that Delgado was seen by Dr. Hernandez, who noticed improvement in Delgado's condition. Although Delgado did not initially recognize the need for medication and, at one point, stopped taking it because of the side effects, Dr. Hernandez reported being able to convince Delgado to restart the treatment plan and that, eventually, Delgado accepted that he needed to remain medicated.

At the conclusion of the penalty phase, the jury recommended death by a vote of eight to four. The trial court conducted the Spencer hearing on January 13, 2012. In its sentencing order, the court found two aggravating circumstances: prior violent felony[3] based on the contemporaneous conviction for aggravated assault (moderate weight) and that the victim was a law enforcement officer[4] (great

---

3. § 921.141(5)(b), Fla. Stat. (2009) ("The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.")

4. § 921.141(5)(j), Fla. Stat. (2009) ("The victim of the capital felony was a law enforcement officer engaged in the performance of his or her official duties.")

weight).  In mitigation, the court found three statutory[5] and forty-one nonstatutory

mitigating factors.[6]

---

5.  The statutory mitigators were: (1) Delgado had no significant history of prior criminal activity (considerable weight), (2) the murder was committed while Delgado was under the influence of extreme mental or emotional disturbance (substantial weight), and (3) Delgado's age of 34 (little weight).

6.  The nonstatutory mitigators were: (1) Delgado's capacity to conform his conduct to the requirements of law was impaired, but not substantially so (moderate weight); (2) at the time of the offense, Delgado was homeless and under the stress of multiple psychosocial stressors (substantial weight); (3) Delgado is diagnosed with a disorder characterized by impulsivity (moderate weight); (4) Delgado did not plan to commit the offenses (slight weight); (5) Delgado "had a long standing, potentially genetic, psychiatric illness," and "the disease is outside of his control" (given "weight consistent with the [judge's] determinations [regarding the statutory mental health mitigators]"); (6) Delgado considered suicide after the murder (little weight); (7) he is capable of forming good relationships (little weight); (8) he experienced a dysfunctional family life as a child (little weight); (9) he was subjected to domestic violence and witnessed domestic violence upon his mother (little weight); (10) Delgado was raised by paternal grandparents due to abandonment by his mother (little weight); (11) Delgado has strong spiritual standards (little weight); (12) Delgado was considerate towards his family (little weight); (13) he has a family who loves and cares about him (little weight); (14) he is a loving son and grandson (little weight); (15) he was a loving husband (little weight); (16) Delgado is a devoted father of two sons and one daughter (little weight); (17) Delgado was the primary caretaker for his youngest child (little weight); (18) he has provided support for his children (little weight); (19) Delgado has a good character (little weight); (20) Delgado can be a good friend (little weight); (21) he is not known, prior to this case, to be a violent person (little weight); (22) he is friendly, outgoing and has a good sense of humor (little weight); (23) Delgado has a desire to help others, shows kindness to others and has demonstrated concern for others and unselfishness (little weight); (24) he expresses gratitude for kindness shown to him (little weight); (25) Delgado served as a police officer for five years and experienced his first hospitalization after leaving the police department (little weight); (26) he honorably served in the United States Army until his mental illness and medical condition interfered with continued service (little weight); (27) he has demonstrated appropriate courtroom

- 19 -

## II. ANALYSIS

Delgado raises three issues on appeal.[7]  However, his primary argument is that his death sentence is disproportionate.  Our conclusion on proportionality renders his remaining claims moot, but for the sake of clarity, we also address his claim that the trial judge used an incorrect standard relating to a jury override.  As part of our mandatory duty to examine the sufficiency of the evidence, we find— and the parties do not dispute—that there was sufficient evidence here to uphold Delgado's first-degree murder conviction.

---

behavior (little weight); (28) his behavior in jail has been appropriate in a controlled environment and he will adjust well to prison life (little weight); (29) Delgado has been compliant with medications since the offense (little weight); (30) Delgado is not a psychopath or sociopath and does not have an antisocial personality disorder (little weight); (31) he suffers from a mental illness that is treatable and with medication the severity of his symptoms can be remitted, controlled or lessened (little weight); (32) he has shown remorse and regret regarding his actions in the death of Corporal Roberts and continues to do so (little weight); (33) Delgado was a good student (little weight); (34) Delgado never abused drugs or alcohol (little weight); (35) he suffers from a cognitive disorder, causing memory impairment (little weight); (36) he suffered from medical conditions that caused chronic pain (little weight); (37) Delgado had a strong work ethic (little weight); (38) Delgado has a neuropsychological impairment (little weight); (39) loss of Delgado's grandmother, his primary caretaker, devastated him (little weight); (40) he tried to better himself by going to school (little weight); and (41) he had three documented contacts with law enforcement officers prior to this offense and none of these resulted in violent behavior (little weight).

7.   These issues are that (1) the trial court used the wrong legal standard in deciding not to override the jury's recommendation of death; (2) Delgado's death sentence is disproportionate; and (3) the "victim was a law enforcement officer" aggravator is unconstitutional as applied in his case.

## A. Jury Override

Delgado argues that in deciding whether to override the jury's death recommendation, the trial judge erroneously used the Tedder[8] standard, which only applies when determining whether to override a jury's life recommendation and instead impose a death sentence. Because this is a pure question of law, our review is de novo. State v. Sturdivant, 94 So. 3d 434, 439 (Fla. 2012); Sanders v. State, 35 So. 3d 864, 868 (Fla. 2010) ("Pure questions of law are subject to de novo review.").

This Court has described the Tedder standard as follows:

A jury recommendation under our trifurcated death penalty statute should be given great weight. In order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ.

Tedder, 322 So. 2d at 910. Although Tedder involved a life recommendation by the jury, a death recommendation should also be given great weight. See Phillips v. State, 39 So. 3d 296, 305 (Fla. 2010). However, "regardless of the jury's recommendation, the trial judge must conduct an independent analysis of the aggravating and mitigating circumstances." Id. at 305; Ross v. State, 386 So. 2d 1191, 1197 (Fla. 1980) (explaining that giving great weight to a jury's death recommendation does not require the trial court to impose the death penalty

---

8. Tedder v. State, 322 So. 2d 908, 910 (Fla. 1975).

- 21 -

because the court "must still exercise its reasoned judgment in deciding whether the death penalty should be imposed.").

The trial judge here conducted a thorough weighing of the aggravators and mitigators. In fact, the judge spent a full eighteen pages detailing his findings regarding aggravating and mitigating circumstances before briefly citing the "reasonable person" standard in a subsequent section of the order. The judge then concluded as follows:

> In weighing the aggravating circumstances against the mitigating circumstances, the Court recognizes that the process is not simply a quantitative analysis, but a qualitative one. It is the Court's duty to consider that nature and quality of the aggravating and mitigating circumstances which have been established.
> After carefully considering and weighing the aggravating and mitigating circumstances in this case, the Court finds that the aggravating circumstances presented for the murder of Corporal Roberts outweigh the mitigating circumstances.

Thus, the trial judge clearly engaged in a detailed analysis of the aggravators and mitigators and properly weighed those factors to determine Delgado's sentence. Accordingly, citation to Tedder does not render the trial court's analysis invalid.

### B. Proportionality

Our proportionality review "is not a comparison between the number of aggravating and mitigating circumstances." Williams v. State, 37 So. 3d 187, 205 (Fla. 2010). Rather, it is a qualitative review of such factors, considering the totality of the circumstances as compared to other capital cases. Id. Further, we

remain mindful that the death penalty is proportionate only for those murders characterized as <u>both</u> the most aggravated and least mitigated.  <u>Johnson v. State</u>, 720 So. 2d 232, 238 (Fla. 1998).

In comparing this case to others, we find that it is not one of the most aggravated or least mitigated.  In fact, we have found death to be disproportionate in cases that were less mitigated and at least equally as aggravated as, if not more aggravated than, the instant case.  <u>See</u> <u>Scott v. State</u>, 66 So. 3d 923, 938-39 (Fla. 2011) (finding death disproportionate where trial court found two aggravators— prior violent felony for contemporaneous conviction of aggravated battery (great weight) and committed during the course of an enumerated felony (great weight)— no statutory mitigators, and nine nonstatutory mitigators, each given slight weight); <u>Hess v. State</u>, 794 So. 2d 1249, 1266 (Fla. 2001) (reducing to life where court found two aggravators—prior violent felony and committed during a robbery—no statutory mitigators, and sixteen nonstatutory mitigators); <u>Johnson</u>, 720 So. 2d at 238 (finding death a disproportionate penalty in light of two aggravators— committed during a burglary/for pecuniary gain (merged) and prior violent felony—statutory mitigator of age (22), and six nonstatutory mitigators); <u>Farinas v. State</u>, 569 So. 2d 425, 427-28 (Fla. 1990) (reducing to life sentence where court found two aggravators—committed during a kidnapping and murder was especially heinous, atrocious, or cruel—and in mitigation, found extreme mental or

emotional disturbance and impaired capacity, although not substantial, and assigned little weight to both).

Here, the trial court found two aggravators: prior violent felony based on the contemporaneous conviction for aggravated assault for pointing a gun at Sergeant Mumford while attempting to flee the scene (moderate weight) and that the victim was a law enforcement officer (great weight). Although the prior violent felony aggravator is considered a weighty one, that aggravator does not carry as much weight here where it is based on an act that did not result in an injury, was committed contemporaneous to the murder, and is "qualitatively [less] compelling" than in cases where the defendant has a significant history of prior violent crimes or where the prior felony is murder or attempted murder. See, e.g., Scott, 66 So. 3d at 936; Johnson, 720 So. 2d at 238; see also Hess, 794 So. 2d at 1266 (finding that the prior violent felony aggravator in that case was "not as 'weighty' as it normally would be in cases where the defendant has a significant history of prior violent crimes, which includes prior murders"). We do not highlight these facts to minimize the aggravated assault, but to "place this 'prior violent felony' aggravator in context of the proportionality of the death sentence and to evaluate the circumstances qualitatively." Scott, 66 So. 3d at 935.

The trial court also found three statutory mitigators—no significant prior criminal history (considerable weight), that the murder was committed while under

the influence of extreme mental or emotional disturbance (substantial weight), and Delgado's age of 34 (little weight). The nonstatutory mitigators included that (1) Delgado's capacity to conform his conduct to the requirements of law was impaired, but not substantially so (moderate weight); (2) at the time of the offense, Delgado was homeless and under the stress of multiple psychosocial stressors (substantial weight consistent with the judge's determination regarding extreme mental or emotional disturbance); (3) Delgado was diagnosed with a disorder characterized by impulsivity (moderate weight consistent with the judge's determination regarding Delgado's capacity to conform his conduct); (4) Delgado did not plan to commit the offenses (slight weight); (5) Delgado "had a long standing, potentially genetic, psychiatric illness," and "the disease is outside of his control"; and thirty-six other nonstatutory mitigators, each given little weight. Delgado's case is more mitigated than Scott, Hess, Johnson, or Farinas, and arguably less aggravated. This evidence leads to the conclusion that this is not one of the most aggravated and least mitigated of capital murders. Thus, we find the death penalty disproportionate under the facts and circumstances presented here.

## CONCLUSION

We do not downplay the fact that Corporal Roberts lost his life as a result of Delgado's actions; however, for the reasons expressed above, we are compelled to reduce Delgado's sentence to life imprisonment because death is not a

proportionate penalty when compared to other cases. Accordingly, we affirm

Delgado's convictions but reverse his sentence of death and remand to the trial

court with directions to impose a life sentence.

It is so ordered.

LABARGA, C.J., and PARIENTE, QUINCE, and PERRY, JJ., concur.
LEWIS, J., concurs in result.
CANADY, J., concurs with an opinion, in which POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.

CANADY, J., concurring.

I agree with the conclusion that the death sentence imposed on Delgado

cannot withstand scrutiny under this Court's comparative proportionality

jurisprudence. In Yacob v. State, 136 So. 3d 539, 557-63 (Fla. 2014) (Canady, J.,

concurring in part and dissenting in part), I expressed the view that the exercise of

proportionality review by this Court is inconsistent with the conformity clause of

article 1, section 17, of the Florida Constitution. My view on the subject was,

however, expressly rejected by the Court majority. Until the State presents an

argument justifying receding from our precedent on the subject that was clearly

established in Yacob, I will follow that precedent. Accordingly, I agree with the

decision to overturn the sentence of death imposed in this case.

POLSTON, J., concurs.

An Appeal from the Circuit Court in and for Hillsborough County, Emmett Lamar Battles, Judge - Case No. 292009CF014276000AHC

James Marion Moorman, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Carol Marie Dittmar, Senior Assistant Attorney General, Tampa, Florida,

for Appellee